UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § § | CASE NO. 10-35732 |
| ISC Building Materials, Inc., | § § | CHAPTER 11 |
| Debtor | § | |

### AFFIDAVIT IN SUPPORT OF FIRST DAY MOTIONS

TO THE HONORABLE KAREN BROWN, UNITED STATES BANKRUPCY JUDGE:

*Brent Burns*, being duly sworn, deposes and states: I am a Vice President (Finance) in the employ of ISC Building Materials, Inc., ("ISC") the debtor and debtor in possession in the proceedings. I am generally familiar with the day-to-day operations, business and financial affairs and books and records of Debtor.

1. On July 6, 2010, (the "Petition Date"), Debtor filed a petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas.

2. To enable the Debtor to minimize the adverse effects of the commencement of its chapter 11 case on business, the Debtor has requested relief in a number of applications and motions (collectively the "First-Day Motions"). The First-Day Motions seek relief intended to, among other things, provide for Debtor in Possession financing, maintain ongoing contracts which have value to the estate, and engender customer confidence. Each First-Day Motion is crucial to the Debtor's reorganization efforts.

3. I submit this Affidavit in support of the First-Day Motions. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First-

Day Motion. All facts set forth in this Affidavit are based on my personal knowledge, upon information supplied to me by others employed by the Debtor, upon my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtor's operations, financial conditions and its present liquidity crisis. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am duly authorized to submit this Affidavit.

4. The Debtor is a Texas small business corporation owned entirely by Mr. Allan Burns, my father. The Debtor operates as a distributor and retailer in the Building Materials supply industry. ISC has been in business for 38 years. During the past 12 months it has had operations throughout Texas in Houston, Huntsville, Waco, Prosper, College Station, San Antonio, Austin, Tyler, Dallas, Waxahachie, Ennis, Longview and Ft. Worth. It currently operates wholesale sales and warehouse locations in Houston, San Antonio, Austin, Dallas, Ft. Worth, and Tyler. It operates one remaining retail lumber facility in Ennis, Texas. ISC distributes Wall Board, Metal Studs, Ceiling Tile, and Insulation in its wholesale yards. ISC sells lumber, general building materials and tools to builders and consumers in its Ennis location called, "Blazek Building Materials."

5. For the thirteen month period ending June 30, 2010, the Debtor reported gross revenues of $54,924,587. The Debtor's revenues are generated exclusively from building materials sales.

6. Debtor's business involves sourcing, stocking, delivering and selling building materials and hard goods. Its inventory is not easily subject to degradation due to passage of time although market prices for its chief lines are set by the general commodities market in

which ISC operates and therefore inventory value is subject to changes in general market conditions beyond the control of ISC.

7. ISC maintains an aggressive collection system utilizing materials liens on a regular basis. The company has a low rate of bad debts and most accounts receivable turn within 30 to 45 days.

8. By the nature of their business and the volume of sales, trade debt is largely short cycle invoicing for materials placed on customer sites and incorporated into building projects shortly thereafter. Debtor's operations involve daily movement of inventory and delivery work on customer's sites. Debtor maintains a fleet of specially adapted lift trucks, delivery vehicles, lifts and forklifts which provide necessary and marketable logistical support to builders and other customers. Delivery services are generally provided during normal working hours but significant delivery activity occurs after hours where site or operating circumstances require after hours supply. Sales are both immediate and, on larger projects, long term and are seasonally affected.

9. <u>Events Leading to Chapter 11</u>. Debtor's chapter proceeding is entirely caused by losses sustained as a result of significant slowdowns in building activity since 2008 combined with a general reduction in prices for the commodity goods handled by the company. These forces caused reduction in both gross sales and gross margins. As the debtor's cash has dwindled, debtor has suffered from a loss of competitive purchasing advantages withdrawn by vendors as Debtor's liquidity crisis deepened. Legacy inefficiencies in Debtor's management structure and business methods contributed to narrowing gross profit margins. These factors placed debtor in a negative operational posture.

10. Operating in a negative profile took its toll on Debtor's asset base and liquidity. Debtor's senior management was resistant to a Chapter proceeding and attempted over the course of dozens of contacts and meetings to seek out alternative credit facilities, assets sales, and recapitalization programs. None of these inquiries produced a solution. As inventory was depleted, and accounts receivable reduced, debtor's access to liquidity, a credit facility based on a computed borrowing base comprised of accounts receivable and inventory balances, similarly diminished. By the Friday before filing, Debtor had no access to this credit facility and had exhausted nearly all of its vendor credit lines.

11. Debtor responded to pressure from its Senior Secured creditor to close facilities including two retail locations and 4 wholesale locations over the past 18 months. In April 2010, debtor engaged counsel, with turnaround experience, to develop and implement a plan for informal reorganization. Following study of the company, a design meeting was held and significant operational issues were identified. Old layers of management responsibility were reduced and replaced with new management level positions and filed with experienced personnel and, by mid June 2010, the debtor's pro forma demonstrated positive EBITDA.

12. During April 2010, demand for debtor's product lines began a steady upswing with orders rebounding from the depressed levels experienced over the winter. April and May saw significantly improved revenues. However, during June, as Debtor's capacity to buy product was choked off, debtor's sales people found themselves effectively shut off from product, orders went unfulfilled and sales declined sharply. Debtor's leading sales staff report that sales activity can be quickly resurrected, but only if inventory becomes available within a few days.

13.     Debtor has seen significant improvement in its operations during 2010 and has returned to pro forma cash flow positive posture. Debtor estimates that it can produce EBITDA sufficient to effectively reorganize under re-structured operational and concomitant debt parameters.

14.     <u>Emergency Motion for Order Authorizing Use of Cash Collateral.</u> The ability of the Debtor to conduct ongoing operations is essential to the Debtor's continued viability. The only holder of a cash collateral position in this case is Comerica Bank, the senior secured lender. The Texas Comptroller of Public Accounts has a statutory position in Cash Collateral to the extent of taxes due and unpaid as of filing. Debtor has been paying those taxes timely. Payment of any claims other than partial payments realized through collection of current accounts receivables is unlikely unless the debtor is permitted to continue operating its business. The attached budget shows debtor's estimate of cash inflow and outflows for the coming 90 days and Debtor's immediate cash needs during the next 15 days.

15.     The Debtor has an urgent and immediate need for cash to continue to operate its business, pay utilities and to seek relief of this Court and to pay vendors, professional fees and expenses, and other expenditures. Without immediate (and ongoing) access to the cash in the Debtor's operating accounts and the cash to be collected after the Petition Date, the Debtor cannot pay current and ongoing operating expenses, including, without limitation, post-petition utilities, payrolls, taxes and necessary vendor products and services. Consequently, the Debtor will suffer irreparable harm, thereby jeopardizing any prospects for success in this case.

16.     The Debtors considered new financing and attempted to obtain additional credit. Debtor held meetings and submitted financial materials for review to Comerica Bank, Wells

Fargo Bank, Frost Bank, Gulfstar Group, Inc., and others. None were willing to extend additional credit prior to filing.

17. <u>Application to Employ Counsel and Administrative Order on Fees</u>. If the debtor is not permitted to use the proceeds of its operations to fund its operations, it will have to close down its operations, and lose the value of its presence, location and marketability as a going concern. The best predictable return for this estate is from the continued operation of the business and utilization of assets in place for that purpose.

18. ISC, debtor, will submit a Motion for Employment of Professionals- Counsel for the Debtor contemporaneously with this Motion.

19. In that Motion, debtor indicates that counsel was retained pre-petition and that of the initial $21,039 retainer, $1,039 was disbursed for filing fees, $17,408.33 was disbursed for prepetition services with the balance remaining on deposit.

20. Debtor is entitled to representation and counsel for the debtor should be paid on a reasonable basis.

21. Further, in order to reduce the overall administrative burden in this case and to facilitate timely payment of counsel, debtor has submitted a Motion for Administrative Order asking that the court authorize debtor's counsel, or counsel for any committee appointed in this matter, to submit regular monthly invoices for services performed together with a invoice of the same being filed with the court. Debtor seeks to have all such invoices deemed provisionally approved unless, within five days of filing, an objection is filed by any party in interest. If no objection is filed, then debtor may pay each such invoice to the extent of 80% of the face amount

of the invoice. If an objection is filed, then no payment shall be made against any such invoice until the court authorizes payment pursuant to a regular quarterly Motion for Approval of Attorney Fees and Costs.

22. The first monthly invoice shall be filed for August 1, 2010.

23. In any event, once per calendar quarter, commencing with the first of October, counsel shall submit a motion for Approval of Attorney Fees and Costs in the form usually required by the court for approval of fees and costs incurred and billed during the prior calendar quarter. The Court's ruling on such application shall result in either the 20% retainage, or any other or different amount that the court deems appropriate, being paid to counsel. If the court disallows the application in an amount in excess of the 20% retainage, counsel shall issue a credit against future services in the amount so disallowed, or, if on final fee application, counsel shall issue a refund within 10 days of the court's order.

24. <u>Pre-Petition Payroll Motion</u>. Debtor has submitted a request to use cash collateral and to pay pre-petition payroll due on the date of filing. The total amount of payroll debtor seeks is to disburse is for one weekly payroll period alone. Payroll is due for all 99 employees across all functional levels of the company. The logistics department employs persons with specialized training and certifications in operating equipment not readily available without significant cost and down time. The Sales department employs individuals with significant industry and personal contacts not easily replaced if their loyalty is attracted elsewhere due to non payment. In general, the company is staffed by experienced personnel who have withstood several months of downsizing and consolidation and each one is, at this point, essential to the effective and efficient operation of the company. Without permission to pay its regular weekly payroll debtor

is unlikely to retain its sales and labor pool. The amount of pre-petition payroll outstanding at filing is $67,327.96.

25. <u>Motion to Permit Debtor to Honor Outstanding</u>. The Debtor had issued checks in due course of operating its businesses. A few checks remain unpaid as of filing date. A schedule of those checks is attached to the debtor's Motion. Accordingly, Debtor has instruments outstanding which will be presented to the bank for payment post petition. The total of these instruments is $156,102.84. These instruments represent payment in due course to the individual vendors and employees and do not represent payment against scheduled antecedent debt except to the extent that older instruments which represent tender of payment but are un-cashed represent payment on debt which, if still outstanding, would be scheduled debt. Honoring these instruments will further the Debtor's reorganization and reduce priority claims.

26. <u>Motion to Permit Retention of Pre-Petition Credit Arrangements with COMDATA et als</u>. A significant part of Debtor's operations involves the use of a fleet of trucks and specialized forklifts and other lift equipment. These items are spread out across the debtor's numerous locations in Texas. Drivers in charge of these vehicles are provided with cards issued by COMDATA, Comerica Mastercard and Texas Fleet Fuel. These cards are funded by electronic deposit of ISC funds directly to the card issuer. Drivers are then able to purchase fuel, and maintenance services, on these accounts by presentation of the cards to vendors. This system provides centralized accounting controls, immediate access to data, and a broadly recognized source of payment. Interruption in this method of payment would mean almost immediate suspension of operations. There are minimal fees associated with use of this system. Funds deposited to COMDATA are useable by drivers immediately and there is no significant

pre-petition debt with these vendors. Utilizing these accounts is necessary to maintaining ISC's ability to fulfill orders and remain viable.

27. <u>Cash Management Motion</u>. Debtor has maintained deposit accounts with several banks Pre-Petition. The primary operating account has been with Comerica Bank. Debtor has already taken action to open a Debtor in Possession Bank account with Comerica. Debtor also maintained accounts with Bank of America in communities were Comerica does not operate. These accounts have been swept in ordinary course and the funds electronically transferred to Comerica after collection. Debtor proposes to maintain these branch accounts only as a depository location for cash and local check deposits with the provision that all receipts of collected funds to these locations will be transferred daily to the DIP account.

28. Debtor also has a payroll account with Comerica Bank. That account does not carry a balance but is utilized weekly for processing payroll disbursements. Over 90 electronic deposit trails are established through that account for payroll disbursements to employees. Debtor proposes to maintain this payroll account solely as a means of disbursement to be funded weekly from the DIP account as permitted by orders of the court.

29. Maintaining these accounts will reduce administrative costs on the estate and will help Debtor to maintain consistency with its staff and its customers.

And, Further, he sayeth not.

_____
Brent Burns

STATE OF TEXAS §
§
COUNTY OF MONTGOMERY §

    Then personally appeared the above named Brent Burns and having identified himself by Texas Drivers License #07832891, was proven to be the person whose name is signed above and made solemn oath that the statements contained herein are true to the best of his knowledge and belief.

Dated: July 8, 2010

_____
Notary Public

SHIRLEY STUBBS
Notary Public, State of Texas
My Commission Expires
February 17, 2013