**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**(HOUSTON)**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ISC Building Materials, Inc. | ) | Case No. 10-35732 |
| A Texas Close Corporation, | ) | (Chapter 11) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DISCLOSURE STATEMENT TO ACCOMPANY FIRST AMENDED PLAN OF
REORGANIZATION
PROPOSED BY THE DEBTOR January 24, 2011)**

Donald L. Wyatt, Jr.
Wyatt Legal Services, PLLC
The Woodlands, Texas 77380
281-419-8733

I. INTRODUCTION............................................................................................................3
    DISCLAIMERS...........................................................................................................4

II. DESCRIPTION OF ISC's BUSINESS AND EVENTS LEADING UP TO THE FILING OF ITS CHAPTER 11 PETITION .........................................................................5
    DESCRIPTION OF ISC's BUSINESS...........................................................................5
    EVENTS LEADING UP TO FILING FOR CHAPTER 11 RELIEF..................................6
    MAJOR EVENTS IN ISC'S CHAPTER 11 CASE .........................................................6

III. SUMMARY OF THE REORGANIZATION PLAN...................................................9
    Plan Funding..............................................................................................................10
    Classification of Claims and Interests........................................................................11
        (a)   Class 1 - Allowed Claims for administrative expenses..........................11
        (b)   Class 2 - Allowed Claims of governmental units ..................................11
        (c)   Class 3 - Allowed Secured Claims..........................................................11
        (d)   Class 4 - Holders of all other Allowed Claims, except Class 5 claims...11
        (e)   Class 5 – Equity ......................................................................................11
    PLAN PAYMENTS .....................................................................................................11
        (a)   Class 1 ......................................................................................................11
        (b)   Class 2 ......................................................................................................12
        (c)   Class 3......................................................................................................12
        (d)   Class 4......................................................................................................12
        (e)   Class 5......................................................................................................13
    POST-CONFIRMATION MANAGEMENT ....................................................................13
    FEASIBILITY ..............................................................................................................13

IV. TAX CONSEQUENCES...........................................................................................15
    Consequences to Debtor...........................................................................................16
    Federal Income Tax Treatment of the ISCBM Post Confirmation Trust.....................17
        (a)   Classification of Liquidating Trust. .........................................................17
        (b)   Tax Reporting. .........................................................................................18
        (c)   Consequence to Holders of Claims. ........................................................18
        (a)   Holders of Claims....................................................................................18
        (b)   Distributions in Discharge of Accrued but Unpaid Interest. ...................19
        (c)   Character of Gain or Loss; Tax Basis; Holding Period............................19
    Consequences to Holders of Interests ......................................................................19
    Withholding ...............................................................................................................20

V. LIQUIDATION ANALYSIS ........................................................................................21

VI. RISK FACTORS.......................................................................................................22

VII. STATEMENT OF SUPPORT..................................................................................22

VIII. CONFIRMATION OF THE PLAN .........................................................................23
    VOTING .....................................................................................................................23

IX. CRAM DOWN PROVISIONS ..................................................................................23

X. CONFIRMATION STANDARDS................................................................................24

XI. OBJECTION TO CONFIRMATION..........................................................................24

XII. EFFECT OF CONFIRMATION ...............................................................................25

XIII. RECOMMENDATION ............................................................................................25

## I    INTRODUCTION

Pursuant to 11 U.S.C. §1125, and Fed.R.Bankr.P. 3016, ISC Building Materials, Inc. ("ISC" or the "Debtor"), a Texas Close Corporation, respectfully submits this Disclosure Statement in connection with the solicitation of votes in favor of the FIRST AMENDED PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR (January 24, 2011) (the "Plan"). A copy of the Plan (with all attachments thereto) is attached hereto as Exhibit A.  Unless otherwise defined herein, all capitalized terms contained in this Disclosure Statement shall have the meanings given to them in the Plan.

The Bankruptcy Court has entered an Order, in the form attached hereto as Exhibit B (the "Disclosure Statement Order"), approving this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable holders of Allowed Claims against, and Allowed Interests in, ISC to make an informed judgment respecting whether to accept or reject the Plan. Approval of this Disclosure Statement by the Bankruptcy Court does not constitute a determination by the Bankruptcy Court of the fairness or merits of the Plan. You must make that determination for yourself.

THE HOLDERS OF CLAIMS AND INTERESTS HAVE RECEIVED WITH THIS DISCLOSURE STATEMENT A BALLOT FOR THE PURPOSE OF VOTING FOR OR AGAINST THE PLAN. AFTER CAREFULLY REVIEWING THE PLAN, AND THIS DISCLOSURE STATEMENT, INDICATE YOUR ACCEPTANCE OR REJECTION OF THE PLAN BY VOTING FOR OR AGAINST THE PLAN ON THE ENCLOSED BALLOT, SIGNING IT AND RETURNING IT BY 5:00 P.M. ON OR BEFORE February 14, 2011, TO THE FOLLOWING ADDRESS:

Donald Wyatt, Attorney for the Debtor
26418 Oakridge Drive
The Woodlands, Texas 77380

This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission ("SEC"), nor has the SEC passed upon the accuracy or adequacy of the statements contained herein.

The Bankruptcy Court has scheduled a hearing to consider the confirmation of the Plan on _____, 2011 at _____ __.m. in Courtroom ____of the United States Bankruptcy Court, 515 Rusk Street 4th Floor, Houston, Texas. Objections to confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on or before _____ . If the Bankruptcy Court confirms the Plan, you will be bound by the terms of the Plan regardless of whether you vote to accept the Plan.

ISC SUPPORTS CONFIRMATION OF THE PLAN AND URGES ALL HOLDERS OF CLAIMS IN IMPAIRED CLASSES TO VOTE IN FAVOR OF THE PLAN.  THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS ALSO SUPPORTS

CONFIRMATION OF THE PLAN AND URGES ALL HOLDERS OF UNSECURED CLAIMS TO VOTE IN FAVOR OF THE PLAN.

ISC'S SOLE DIRECTOR, ALLAN BURNS, HAS DETERMINED THAT IF THE PLAN IS NOT APPROVED IT IS UNLIKELY THAT ALL THE HOLDERS OF ALLOWED CLAIMS AND ALLOWED EQUITY SECURITY INTERESTS WILL RECEIVE DISTRIBUTIONS OF ANY VALUE.

DISCLAIMERS

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT AND THE DATE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDINGS INVOLVING ISC, OR ANY OF ITS OFFICERS, DIRECTORS, SHAREHOLDERS, REPRESENTATIVES, AGENTS, ATTORNEYS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON HOLDERS OF CLAIMS OR INTERESTS. THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN. EACH CREDITOR IS ENCOURAGED TO READ AND CONSIDER CAREFULLY, AND ANALYZE THE TERMS AND PROVISIONS OF, THE PLAN.


THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT, AS CONTAINING INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE A HYPOTHETICAL, REASONABLE INVESTOR, TYPICAL OF HOLDERS OF CLAIMS AND INTERESTS OF RELEVANT CLASSES TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT, HOWEVER, IS NOT A DECISION ON THE MERITS, NOR ENDORSEMENT OF THE PLAN. THE DATE OF THIS STATEMENT IS THE _____ DAY OF _____, 2011.

## II.  DESCRIPTION OF ISC's BUSINESS AND EVENTS LEADING UP TO THE FILING OF ITS CHAPTER 11 PETITION

DESCRIPTION OF ISC'S BUSINESS

ISC is a leading supplier of construction materials and supplies used in the interior completion of residential and commercial construction projects. Operating from six drywall yards, and one lumber yard, the Company is the largest independent supplier of interior construction materials in the state of Texas. ISC's ability to provide delivery and stocking services to logistically challenging projects, knowledgeable sales staff, competitive pricing and commitment to customer service help distinguish the Company as the premier provider of interior construction materials to a diverse base of more than 2,100 commercial and residential contractors.

ISC's interior products division provides drywall, metal studs, ceiling tiles and grids, insulation and related interior construction materials and supplies to commercial and residential contractors. Each of the Company's six drywall yards offer over 500 stock keeping units ("SKUs"). The Lumber yard has over 15,000 SKUs.  More than 80% of products sold by ISC are delivered directly to the customer's residential or commercial construction site. The Company provides custom delivery and stocking services, including rooftop and multilevel stocking, as requested by the customer based upon job requirement. ISC's experienced delivery and stocking teams utilize a fleet of more than 130 company-owned material handling vehicles and related equipment including boom trucks, forklifts and a variety of delivery trucks, to accommodate any commercial or residential construction project. The Company is thus differentiated by its ability to provide safe and reliable delivery and stocking services for logistically challenging projects.

The demand for the Company's products and services is primarily driven by residential and commercial construction activity. Since December 2007, the U.S. construction industry has been severely impacted by the credit crisis and economic recession. Recently, however, several favorable trends have emerged that are expected to positively affect ISC going forward including the stabilization of the US housing market, a projected increase in U.S. demand for drywall and lumber, additional federal stimulus funding for institutional construction projects and a positive economic outlook surrounding the Company's primary markets. ISC's Texas markets have weathered the economic recession far better than most and are expected to realize significant growth in the next 25 years. Net migration to Texas is projected to be twice that of the next state and come at the expense of the Northeast and Midwest. ISC's strategic warehouse locations position the Company in the areas projected to collectively contribute 98% of the state's economic growth over the next 25 years. The Company's current infrastructure is capable of supporting significant growth in new and existing product offerings and locations.

EVENTS LEADING UP TO FILING FOR CHAPTER 11 RELIEF.

From 2004 to 2008, ISC expanded rapidly into several smaller supplemental locations that enabled the Company to more readily service customers working in those areas. As construction activity slowed in late 2008, ISC was left with substantial inventories in contracting markets that it was unable to sell at reasonable prices. To address the financial impact of falling demand, management began restructuring operations and ultimately closed six unprofitable locations, 4 drywall yards and 2 lumber yards.  During the reorganization process, the company discovered several inherent weaknesses in management and procedures that had lead to unprofitable sales activities and resulting erosion of Gross Sales margins.  Some of these practices were so flagrant that customers had lost confidence in the sales people involved and some management personnel.  These problems were addressed immediately pre petition and during administration of the case to result in significant improvements of sales and margin production.  Due to heavy losses from discontinued locations and the final funding of a former shareholder buyout, it was difficult for the Company to service its debt and in July 2010 filed for protection under Chapter 11 of the U.S. Bankruptcy Code.

ISC has since completed the buy-out of a former shareholder, reorganized operations to focus on its core markets and implemented best practices including inventory stratification and the optimization of gross margins, distributor performance and sales and marketing. The Company therefore considers the income statement impact of discontinued locations to be non-recurring. Pre-petition total FY 2010 EBITDA losses across discontinued locations totaled $1.7 million on $9.1 million of revenue and were primarily responsible for the Company's current liquidity situation. ISC is currently operating as a debtor in possession ("DIP") of the estate and in early October secured a DIP loan from its incumbent lender that was expected to provide adequate liquidity to fund operations throughout the administration period. Vendors have remained supportive of ISC as in many cases the Company is the largest distributor in Texas of their products.

MAJOR EVENTS IN ISC'S CHAPTER 11 CASE

ISC filed for protection under the provisions of Chapter 11 of the Bankruptcy Code on July 6, 2010. Shortly thereafter, ISC filed an application to retain Wyatt Legal Services, PLLC ("PLLC"), as its counsel. On July 7, 2010, ISC filed its first day Motions including a Motion to use Cash Collateral.  Shortly thereafter, ISC and Comerica Bank, entered into a stipulation for use of Cash Collateral.  Two months latter, that stipulation was followed by a Motion and Stipulation authorizing a Debtor in Possession credit facility that featured an additional $850,000 in liquidity for Debtor's operational use under an agreed budget.  The court approved that facility.

ISC filed its Statement of Financial Affairs, Schedules of assets and liabilities and related documents with the Bankruptcy Court on July 7, 2010.  Following completion of work investigating the prepetition affairs of the Debtor, ISC contemplates filing amendments prior to confirmation.  The major effect of these amendments will be to devalue the

estimated value of litigation claims listed by ISC as assets as the post petition performance of the company has proven to reduce, but not eliminate, the value of those claims based on mitigation of the deleterious effects of pre and post petition conduct of a former company officer.

During the course of the case, counsel was engaged in the ordinary course of Debtor's affairs to continue the pre-petition pattern of collection activity for the company.  In addition, auditors were employed to compile audited financials, assist with 401K administration, and complete year end tax returns for tax year 2009 and 2010.  One such matter has resulted in litigation as an Adversary Proceeding filed on September 3, 2010 and assigned docket# 10-03410 in the Bankruptcy Court.  Debtor and a customer, M. Christopher Homes, are disputing the collection of $150,000+- in that lawsuit.  Discovery is under way in that case with Trial Schedule during mid May, 2011.

In September, 2010, the court approved the engagement of GulfStar Group, II, Ltd ("GulfStar") of Houston to act as investment advisors and investment bankers to the Debtor.  GulfStar engaged in a process of investigation, due diligence and review that resulted in the development of a marketing campaign aimed at producing a buyer for the company, or its assets, as a going concern.

GulfStar's efforts encompassed the following:

9/19/2010  GulfStar approved by court to be employed by ISC

9/19 - 10/20/2010
Drafted Confidential Information Memorandum ("CIM")
Prepared multi-year projection model
Complied list of prospective buyers; 130 total (89 private equity groups, 41 corporations)
Drafted anonymous executive summary ("Teaser") under the title "Project Build"

10/18/2010  Distributed Teaser to prospective buyers

10/18 - 10/29/2010 Executed confidentiality agreements and sent CIM to interested parties

10/19 - 10/29/2010 Follow-up calls and emails to all executive summary recipients

11/4/2010 - Distributed letter to parties receiving CIM outlining process for submitting an initial indication of interest ("IOI")

11/19/2010 - Indications of interest received (2 for full company, 1 for drywall division only {rec'd. 12/6/2010}, 2 for lumber division only)

7

11/22/2010 - Opened online data room to parties submitting indications of interest

11/29 - 12/15/2010 - Management Meetings and site visits

12/11/2010 - Draft purchase agreement sent to parties submitting indications of interest for full company or drywall division

12/20/2010 - Draft purchase agreement sent to parties submitting indications of interest for lumber division only

As of the date of the Proposed Plan, Debtor has received 5 offers to purchase assets of the company from this pool.

As a result of this marketing activity, the Debtor has been presented with groups of offers for two separate sales of assets; one group encompasses the Ennis Lumber Yard known as "Blazek Building Supply" and the other group encompasses the balance (or bulk) of the assets of the company engaged in the Drywall supply business.  All offers received to date have been predicated on the company continuing to operate through the sale process so that Buyers step into possession of a going concern.  There is one bidder who has made an offer for the entire company.

On December 31, 2010, Debtor submitted a Plan of Reorganization and Proposed Disclosure Statement to the court for consideration.  The Plan called for sale of the Debtor's assets in 2 lots.  The proceeds of sale were to be utilized to retire administrative claims, including all allowed 503(b)(9) claims, and pay off the secured claims of Comerica Bank.  The estimated return to unsecured creditors was to be at least 6% and was subject to an auction process that might improve that return.

On December 31, 2010, Debtor submitted a Motion for Approval of Bidding and Sales Procedures for 2 Lots of Assets.  Lot A was designated as the Drywall Division of the company and Lot B was designated as the Ennis Lumber Yard Division of the company.  Following further negotiations, and with GulfStar's assistance, On January 21, 2011, Debtor submitted an agreed order respecting Bidding and Sales Procedures for Lot B only.  The Ennis Lumber Yard sale is still pending, and it is anticipated that those proceeds will be applied to costs of sale and then in payment to Comerica Bank under 11 USC 363.

On January 21, 2011, Debtor and the Official Committee of Unsecured Creditors reached an accord on amending the terms of the Debtor's original Plan of Reorganization.  Under this accord, Allan Burns, and his family, will have the opportunity to bid against third parties to retain the assets of the company and reorganize the business.  In return, the Family has offered, in essence, to make the future tax benefit of the accumulate Net Operating Losses available as additional dividend to the Unsecured Creditors.  If the Family Group submits a bid and qualifies to be a bidder, the Burns Family Group will begin its bidding with a bid of cash and property sufficient to pay all senior claims and to

8

pay the Unsecured Creditors at least 6% in cash and an additional 38% in the form of 5 year Bonds payable with 1.25% interest.  After the close of bidding, the Unsecured Creditors Committee will choose between the best cash sale alternative and the best and final offer of the Burns Family Group.

The Debtor has maintained a cash reserve from period to period. The Debtor's Monthly Operating Reports are available for inspection and the most recent filed report is attached hereto as a financial summary of the Debtor's operations post petition.  (See Exhibit "D") The Debtor anticipates similar performance during the term of the Plan proposed by the Debtor subject only to unexpected declines in the demand for Debtor's products, if any. See Article IX, "Risk Factors."

The Debtor anticipates that professional fees, and administrative expenses, including US Trustee Fees, will be an additional $88,000.00 incurred between the date of this disclosure and the date of Confirmation.

## III.  SUMMARY OF THE REORGANIZATION PLAN

The Plan that Debtor is proposing, with the support of the Official Committee of Unsecured Creditors, calls for a Bidding and Sales process where the Burns Family Group is allowed to bid at auction for the company provided that they financially qualify and demonstrate the ability to contribute significant new equity to the company and obtain third party support in the form of credit or equity sufficient to fund payment in full of Claims held by Classes 1, 2 and 3.  This determination will be made in advance of the final live auction. All bidders, cash bidders and the Burns Family Group, will bid at the same auction event.  Bidding will proceed by cash bidders at an overbid rate of $100,000 per bid and by the Burns Family Group at an overbid rate of 2% of Allowed Unsecured Claims payment through Bonds per bid.  At the end of the bidding process, the Burns Family Group will be required to enter its final bid and then the high cash bidder will be allowed to enter its final cash bid.  The Unsecured Creditor's Committee will then have the right and duty to select between the two final bids.  The Committee will not be bound to determine Net Present Value or simply compare gross dollars received.  Rather, the committee will be empowered by the plan to exercise its business judgment and select between the two final bids and economic and other business factors.  The Committee will not be subject to lobbying by either bidder.  Their decision will be binding on all parties.

Under this Plan, unsecured creditors can expect a minimum of 6% of each allowed secured claim and, if the Burns Family Group is successful in winning the bid process, then unsecured creditors will receive at least an additional 38% of their allowed claims

paid by way of a Bond that is payable in 5 years and carries 1.25% simple annual interest. Since an Auction is to be held, both cash payments at Closing and the magnitude of Bonds to the issued by the Burns Family Group may return significantly greater dividends to unsecured creditors.

In addition, if a cash bidder is the Selected Reorganization Alternative, then the Unsecured Creditors will also be vested with all Post Confirmation Collection Cases and Chapter Five (insider transfers and other avoidable pre-filing activities) causes of action as they will be administered for their benefit as a Class by the ISCBM Post Confirmation Trust (a liquidating trust).

The Debtor's proposed Plan of Reorganization is based on a sale of the assets of the Debtor's business as a going concern in competing Lots followed by payment of Administrative and Tax Claims and senior secured claims. If there are any proceeds of this process in excess of the amount necessary to pay 100% of the claims of unsecured creditors, then and only then, will owners of ISC's equity be entitled to a distribution.  IT IS NOT ANITICPATED THAT THE SALE PROCESS WILL RESULT IN FULL PAYMENT TO THE UNSECURED CLASS OF CREDITORS.  IT IS EXPECTED THAT NO DISTRIBUTION IS LIKELY TO OCCUR TO EQUITY.

THE DEBTOR EXPECTS THAT RECOVERY FOR UNSECURED CREDITORS WILL BE AT OR ABOVE 6% OF THE AMOUNT OF ALLOWED CLAIMS.

PLAN FUNDING.

It is anticipated that the Plan will be funded out of the operating revenues of the Debtor until the Sale of Assets have been closed.  The Plan will then be funded out of the net proceeds of such sales, any remaining cash assets of the Debtor following turnover of the business assets to new owners, if any, and proceeds of causes of action that are to be transferred to the Trustee of the ISCBM Post Confirmation Trust (a liquidating Trust), if any.  These causes of action include any proceeds of actions that the Debtor may have against any party under the provisions of Chapter 5 of the Bankruptcy Code pertaining, in part, to pre-petition activities of insiders and other non-permissible transfers, if any. Investigation and prosecution of these causes of action is placed in the hands of the Trustee of the ISCBM Post Confirmation Trust unless the Burns Family Group is the successful buyer.  In that case, the Unsecured Creditors will have agreed, by virtue of this plan, to forego creation of the Post Confirmation Trust and they will have agreed that all property and causes of action that might, under the Plan, have become property of the Trustee will instead remain the property of the Reorganized Debtor.  In such a case, the Reorganized Debtor will have no duty to pursue any such causes of action for the benefit of any party to this Chapter proceeding.  Debtor does not anticipate that Chapter 5 causes of action will yield any return for creditors but the possibility of a return is not foreclosed by the Plan except as stated above.

10

CLASSIFICATION OF CLAIMS AND INTERESTS.

The Plan provides for the classification of claims against ISC into five separate classes and provides for cancellation of all equity interests as of the effective date of the Plan.

(a) Class 1 - Class 1 shall consist of creditors holding Allowed Claims for administrative expenses pursuant to 11 U.S.C. §503(b) and shall include all payments due to the United States Trustee.  This Class includes, but is not limited to, post-petition expenses of ISC, including unpaid taxes and amounts owed to, WLSPLLC for its services as ISC's counsel in this Chapter 11 case, the claims of Chris Williams, GulfStar Group, II, Ltd., for services as ISC's CRA which are approved by the Bankruptcy Court, and claims of any other professional persons whose retention and fee request(s) have been approved and allowed by the Bankruptcy Court.  In addition, this class includes all payments due by the reorganized debtor to the United States Trustee on account of quarterly fees payable prior to closing of the contemplated sales and transfer of remaining assets to the Trustee of the Liquidating Trust.

(b) Class 2 - Class 2 shall consist of creditors holding Allowed Claims of governmental units incurred pre-petition and entitled to priority under 11 U.S.C. § 507(a)(8).

(c) Class 3 - Class 3 shall consist of the Allowed Secured Claims, if any, of Comerica Bank.

(d) Class 4 - Class 4 shall consist of the holders of all other Allowed Claims, except Class 5 claims, whether having arisen prior to commencement or as the result of any cancellation, or rejection of any executory contracts.

(e) Class 5 – Class 5 shall consist of all equity security holders of the Debtor on the Date of Confirmation of this plan.

PLAN PAYMENTS

The Debtor proposes to pay these classes out of the Plan proceeds as follows:

(a) Class 1 (Section 507(a)(1) Allowed Administrative Claims).  Unless a holder agrees to less favorable treatment, the holders of Allowed Administrative Claims shall receive on account of such Claims cash in the full amount of such Claims and expenses in accordance with the ordinary business terms of payment of such Class 1 Claims.  Notwithstanding the foregoing, to the extent that fees have been approved and not paid prior to final fee applications being submitted and approved, professionals employed at the expense of the estate and entities who may be entitled to allowance of fees and expenses from the estate pursuant to

Sections 503(b)(2)-(6) of the Bankruptcy Code, shall receive cash in the amount awarded to such professionals and entities by the Order of the Bankruptcy Court no later than, and as soon as practicable after, the latter of the Effective Date or the date on which an Order approving of said fees enters.  Holders of Class 1 claims may continue to submit fee statements as per the terms of any pre-confirmation administrative orders governing allowance of fees.  Fees provisionally or finally allowed pursuant to any such administrative orders may be paid in due course post confirmation, or out of any closing held under this plan, as and when allowed pursuant to those pre-confirmation orders and the terms of this Plan.  The fees of counsel for the Debtor, and counsel for the Official Committee of Unsecured Creditors reflected on Monthly Fee notices pursuant to said administrative orders and filed with the court prior to the date of the Confirmation Order on this Plan shall be deemed finally allowed as of the Effective Date of the Plan.  Fees sought by Professionals incurred or invoiced for any period not previously filed with the court prior to the date of the Confirmation Order on the Plan shall remain subject to approval of the court according to the terms of said pre-confirmation administrative orders.   The Class 1 claims are being treated consistent with 11 U.S.C. §1129(a), and are not impaired under the plan.

(b)   Class 2 (Section 507(a)(8) Allowed Governmental Unit Claims).  Unless a holder agrees to less favorable treatment, Allowed Claims of governmental units, shall be paid in full within 30 days of the effective date of the Plan.  The Class 2 Claims are being treated consistent with 11 U.S.C. §1129(a), and are not impaired by the Plan.

(c)   Class 3.  (Allowed Secured Claims of Comerica Bank).  Unless the holder agrees to a less favorable treatment, the Allowed Secured Claims of Comerica Bank shall be paid indefeasibly in full in cash out of closing on the sale transactions contemplated within this Plan, with such indefeasible payment in full being in accordance with the Bank's rights under the Bankruptcy Code.  The Class 3 Claims are entitled under the Post Petition DIP Loan to payment on or before the effective date of the Plan and, therefore, are impaired by the Plan and entitled to vote on the Plan.

(d)   Class 4 (Unsecured Claims).  Unless the holders agree to less favorable treatment, the Class 4 Claims shall be paid a pro-rata share of the remaining proceeds of sale of all assets conducted under this plan up to the full allowed amount of each claim in the form of Cash Down Payments and Unsecured Claim Bonds. The recovery by Class 4 creditors is anticipated to be less than 100% and the holders of Class 4 claims are impaired by the Plan and entitled to vote on the plan.

(e)  Class 5 (Equity).  Unless the holders agree to less favorable treatment, all shares of stock in Class 5 are to be cancelled under the terms of this plan.  In the event that any of the contemplated assets sales hereunder yields a net recovery in excess of all amounts necessary to pay the Allowed amount of all Class 4 claims and above, then all such excess proceeds shall be distributed to Class 5 Equity members.  Class 5 is impaired and entitled to vote on the plan.

POST-CONFIRMATION MANAGEMENT

Following confirmation of the Plan, the corporation will be continue to be operated by Allan Burns and Brent Burns and the existing management team of ISC but only until closing on the sale(s) of assets has occurred.  Thereafter, if he Selected Reorganization Alternative is a Sale of the Drywall Division of the company, then the business of the Debtor will cease, ISC will be dissolved, and the business assets will be owned independent of the Estate of the Debtor by the buyer(s).  If, however, the Selected Reorganization Alternative is a Family Reorganization Proposal, then the corporation will continue in possession of all assets and will be continue to be managed by Allan Burns and Brent Burns.

FEASIBILITY

ISC asserts that the Plan is feasible.  The Plan presents two alternative paths to successful implementation .  In the first, the company operates under appropriate constraints to generate revenues and continue the going concern value of the business and brings that value to auction with a stalking horse bid of $5,500,000.  This bid amount is estimated to be sufficient to pay all Class 1, 2 and 3 claims and to pay a 6% dividend to Unsecured Creditors.  In the second, the company is retained by the Burns Family Group which contributes significant new cash and real estate equities to the business and generates cash sufficient to pay all Class 1, 2 and 3 Claims, and a 6% Cash Down Payment to Class 4.  A competitive auction process is conducted in order to produce the highest and best bids of both types of proposed Reorganization Alternatives.  The final choice between the winning Drywall Division Sale bidder and the Burns Family Group will be made by the Unsecured Creditors Committee.  During the executory period of the Plan all secured creditors are provided with continuing security and the indubitable equivalent of their interests.

ISC has operated during Administration of the case at a loss.  This has been due, in the greatest part, to the inability of the Debtor to access capital/liquidity during the first 8 weeks of the case to purchase goods to meet recovering demand for products.  Sales volumes plummeted post petition by over $1,000,000 per month.  When the Post Petition Credit Facility became operative, Debtor was operating below its Break Even point of $3,100,000 in monthly sales.  Orders had, in many cases, been refused or turned back because the company could not assure customers of timely performance.

While ISC did achieve significant operational improvements, maintenance of company operations in order to be properly positioned in key markets dictated maintenance of

facilities that have operated on a negative cash flow basis.  This enhanced the Sales profile of the company, but it resulted in a cash drain.  It is anticipated that continued access to the Comerica credit facility will keep the company operational until closing on the anticipated sale(s) of assets.

In the event of a Sale of the Drywall Division, the Plan's feasibility centers on the financial strength of the winning Bidder.  The Bidding and Sales Procedures proposed to govern the Sale give GulfStar the obligation to vet bidders and qualify those bidders on the basis of proven financial ability.  Therefore, a Sale of the Drywall Division is a feasible alternative because only qualified bidders will be allowed to bid.

In the event of a Family Reorganization Proposal, feasibility hinges on two factors: 1, the ability of the Burns Family Group to provide cash resources sufficient to satisfy Class 1, 2 and 3 claims together with the 6% cash Down Payment to unsecured creditors at closing; and, 2, the ability of the Reorganized Debtor to generate earnings over the next five  years sufficient to generate net revenues after tax to pay off the Unsecured Claim Bonds at maturity.

The first of these feasibility issues is satisfied by application of the Family Reorgnaization Proposal Procedures.  These procedures give GulfStar the obligation to vet the Burns Family Group's Family Reorganization Proposal and qualify that Group on the basis of proven financial ability to close the transaction.  If the Burns Family Group cannot prove that they have secured resources to close the transaction, then they will not be permitted to bid for the company and a Cash Sale of the Drywall Division will proceed.  But, if the Burns Family Group has established its financial ability to provide sufficient cash to close, then feasibility of this element is reasonably established.

The second of these feasibility issues is depending on actual experience over time and not subject to pre-confirmation or determination.  Over the past three months, both sales activity, and ISC's position in the marketplace have improved.  Management has compiled an analysis of pending orders and anticipated awards that demonstrates significantly increased activity in general in the markets that the company serves and renewed demand for business with the Debtor.  Buyers who had either not had activity in the last 12 months, or who had not solicited bids from ISC post petition, have once again returned to ISC soliciting bids for upcoming awards.

Management reasonably believes that the corporation's sales can exceed the $3,100,000 break even mark within 6 months.  It is anticipated that the cash draw during that period will be no more than $500,000 over anticipated revenues.  Management proposes that a review of the financial data and projections attached hereto provides a reasonable basis

for belief that it is feasible for the debtor to earn a sufficient return (most or all of which will escape federal taxation because of the favorable application of Net Operating Loss Carry Forwards available only under the Family Reorganization Proposal) to fund the retirement of the Unsecured Claim Bonds at their maturity in five years.

Therefore, a Family Reorganization Proposal is a feasible alternative because the Burns Family Group will only be a qualified bidder if it can demonstrate the ability to close and the forward looking projections for post confirmation progress of the company are conservatively illustrative of the Reorganized Debtor's ability to operate profitably and retire its Unsecured Bond Obligations at maturity.

No creditor of the estate will receive under the terms of the Plan less than they would receive if this case were converted to one under Chapter 7.  The expenses of marketing and sale of the company assets have been incurred on an indefeasible basis during administration of the case and would likely be subject to increase if the case were converted and a Trustee was appointed.  In addition, the industry in which the Debtor operates is a colloquial industry.  Customer confidence in continuity of operations and dependability of performance is key in maintaining the value of the business assets.  The Liquidation Value of those assets is significantly less than the going concern value that is being produced by the sale process undertaken during administration.  Creditors cannot be assured that Senior Management, who serve without contract, would remain in place in the event of a conversion to Chapter 7.

Post petition operations of the Debtor have confirmed the Debtor's current operational profile.  Operational losses are anticipated during the brief period between confirmation and closing assets sales.  Debtor reasonably anticipates that those losses will be funded from existing cash reserves and continued use of the Cash Collateral/DIP credit facility in place with Comerica Bank. Although the Debtor's operations are entirely demand based, and, therefore, subject to changes in demand, since continued operation of the Debtor, and prevention of Debtor's liquidation, is conditioned upon successful fulfillment of Plan obligations, creditors and equity holders are better served by operation of the Debtor so long as market demand makes that operation possible.  In this regard, Debtor has seen a significant uptake in customer demand during the fourth quarter of 2010 and has booked orders well into the first and second quarter of 2011 that represent significant improvements in sales performance.  Therefore, Debtor anticipates that the company can operate until closing occurs.

## IV. TAX CONSEQUENCES

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to the Debtor and to Holders of Claims and Interests. This discussion is based on the Internal Revenue Code (USC Title 26), Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and

pronouncements of the IRS as in effect on the date hereof. Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims (including Claims within the same Class) and Interests, the Holder's status and method of accounting (including Holders within the same Class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Furthermore, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtor and the Holders of Claims and Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or the Holders of Claims or Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, regulated investment companies and foreign taxpayers). This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local or estate and gift taxation is addressed.

THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

CONSEQUENCES TO DEBTOR

Under the Plan, the Debtor faces alternative tax consequences.  In the Drywall Division Sale Alternative, Debtor is selling its operational assets and then transferring the remaining Assets to the Liquidating Trust.  This sale and transfer of Assets may result in the recognition of taxable gain or loss by the Debtor. To the extent that any federal income tax liability to the Debtor results from the transfer by it of the Assets to the Liquidating Trust, the Liquidating Trust will pay the resulting tax to the IRS. The Plan also provides that the Debtor will eventually be liquidated and dissolved. As a result, there will be no net operating loss or capital loss carry-forwards or other tax attributes

available to the Debtor following the Effective Date after giving effect to the transactions contemplated by the Plan.

In the Family Reorganization Proposal Alternative, Debtor is proposing to retain its operating assets and to exit Chapter 11 retaining the pre-commencement date tax attributes of its operations over time.  The Plan requires that this alternative be executed in a manner which preserves the Net Operating Loss Carry Forward attributes of the Debtor's tax accounts for use by the Debtor to offset eligible net operating profits in some future years.  The Debtor and all interested parties are cautioned that preparation of applicable schedules and Analysis pursuant to 26 CFR 1.382-1 et seq. is a necessary pre-requisite to utilization of these tax benefits and that the application of those rules is beyond the scope of the presentation.

## FEDERAL INCOME TAX TREATMENT OF THE ISCBM POST CONFIRMATION TRUST

(a)   Classification of Liquidating Trust.  Pursuant to the Plan, the Debtor will transfer the remaining of the Debtor's estate not sold under the Sales Procedures to the Liquidating Trust, and the Liquidating Trust will become obligated to make Distributions in accordance with the Plan. The Plan provides, and this discussion assumes, that the Liquidating Trust will be treated for federal income tax purposes as a Liquidating Trust defined in Treasury Regulation Section 301.7701-4(d), and will therefore be taxed as a grantor trust, of which the holders of Unsecured Claims will be treated as the owners and grantors thereof. Accordingly, because a grantor trust is treated as a pass-through entity for federal income tax purposes, no tax should be imposed on the Liquidating Trust itself or on the income earned or gain recognized by the Liquidating Trust. Instead, the Beneficiaries will be taxed on their allocable shares of such net income or gain in each taxable year, whether or not they received any distributions from the Liquidating Trust me such taxable year.  Although the Liquidating Trust has been structured with the intention of complying with guidelines established by the IRS in Rev. Proc. 94-45, 1994-2 C.E. 684, for the formation of creditor trusts, it is, possible that the IRS could require a different characterization of the Liquidating Trust, which could result in different and possibly greater tax liability to the Liquidating Trust and/or the Holders of Allowed Claims. No ruling has been or will be requested from the IRS concerning the tax status of the Liquidating Trust, and there can be no assurance that the IRS will not require an alternative characterization of the Liquidating Trust. If the Liquidating Trust were determined by the IRS to be taxable not as a creditor trust, as described in Treasury Regulation Section 301.7701-4(d), the taxation of the Liquidating Trust and the transfer of assets by the Debtor to the Liquidating Trust could be materially different than is described herein and could have a material adverse effect on the Holders of Allowed Claims.

17

(b) Tax Reporting.  The Liquidating Trust will file tax returns with the IRS as a grantor trust in accordance with Treasury Regulation Section 1.671-4(a). The Liquidating Trust will also send to each Beneficiary a separate statement setting forth the Beneficiary's allocable share of items of income, gain, loss, deduction or credit and will instruct the Beneficiary to report such items on such Beneficiary's federal income tax return.

CONSEQUENCE TO HOLDERS OF CLAIMS.

The federal income tax consequences of the Plan to a Holder of a Claim will depend upon several factors, including but not limited to; (i) the origin of the Holder's Claim, (ii) whether the Holder is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above), (iii) whether the Holder reports income on the accrual or cash basis method, (iv)

whether the Holder has taken a bad debt deduction or worthless security deduction with respect to this Claim and (v) whether the Holder receives distributions under the Plan in more than one taxable year. HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OP THEIR PARTICULAR CLAIMS.

(a) Holders of Claims.   Generally, a Holder of an Allowed Claim will recognize gain or loss equal to the difference between the Amount realized by such Holder and such Holder's adjusted tax basis in the Allowed Claim. The Amount realized is equal to the sum of the Cash and the fair market value of any other consideration received under the Plan in respect of a Holder's Claim, including, to the extent such Holder is a Beneficiary, the fair market value of each such Holder's proportionate share of the assets transferred to the Liquidating Trust on behalf of and for the benefit of such Holder (to the extent that such Cash or other property is not allocable to any portion of the Allowed Claim representing accrued but unpaid interest (see discussion below)) or in the Alternative, the Net Present Value of the Unsecured Claims Bond issued to any individual Claim Holdeer. The transfer of Assets to the Liquidating Trust by the Debtor should be treated for federal income tax purposes as a transfer of such Assets to the Holders of Allowed Claims to the extent they are Beneficiaries of the Liquidating Trust, followed by a deemed transfer of such Assets by such Beneficiaries to the Liquidating Trust. As a result of such treatment, such Holders of Allowed Claims will have to take into account the fair market value of their pro rata share, if any, of the Assets transferred on their behalf to the Liquidating Trust in determining the amount of gain realized and required to be recognized upon consummation of the Plan on the Effective Date. In addition, since a Holder's share of the assets held in the Liquidating Trust may change depending upon the resolution of Disputed Claims, the Holder may be prevented from recognizing any loss in connection with consummation of the Plan until the time that all such Disputed

18

Claims have been resolved. The Liquidating Trust will provide the Holders of Allowed Claims with valuations of the assets transferred to the Liquidating Trust on the behalf of and for the benefit of such Holders and such valuations should be used consistently by the Liquidating Trust and such Holders for all federal income tax purposes. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.

(b)   Distributions in Discharge of Accrued but Unpaid Interest.  Pursuant to the Plan, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes. Holders of Allowed Claims not previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be treated as receiving taxable interest, to the extent any consideration they receive under the Plan is allocable to such accrued but unpaid interest. Holders previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be entitled to recognize a deductible loss, to the extent that such accrued but unpaid interest is not satisfied under the Plan. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING TI-IE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR ALLOWED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

(c)   Character of Gain or Loss; Tax Basis; Holding Period.  The character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss recognized by a Holder of Allowed Claims under the Plan will be determined by a number of factors, including, but not limited to, the status of the Holder, the nature of the Allowed Claim in such Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Allowed Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Allowed Claim. The Holder's aggregate tax basis for any consideration received under the Plan will generally equal the amount realized in the exchange (less any amount allocable to interest as described in the next paragraph).  The holding period for any consideration received under the Plan will generally begin on the day following the receipt of such consideration.

CONSEQUENCES TO HOLDERS OF INTERESTS

Pursuant to the Plan, all Interests in the Debtor are being extinguished. A Holder of any Interest extinguished under the Plan should generally be allowed a Worthless stock deduction in an amount equal to the Holder's adjusted basis in the Holder's Interest.

A worthless stock deduction is a deduction allowed to a Holder of a corporation's stock for the taxable year in which such stock becomes Worthless. If the Holder held the Interest as a capital asset, the loss will be treated as a loss from the sale or exchange of such capital asset. Capital gain or loss will be long-term if the interest was held by the Holder for more than one year and otherwise will be short-term. Any capital losses realized generally may be used by a corporate Holder only to offset capital gains, and by an individual Holder only to the extent of capital gains plus a specified amount of other income depending upon the tax year of the loss.

WITHHOLDING .

All Distributions to Holders of Allowed Claims under the Plan are subject to any applicable withholding, including employment tax withholding. The Debtor and/or the Trust will withhold appropriate employment taxes with respect to payments made to a Holder of an Allowed Claim that constitutes a payment for compensation.

Payors of interest, dividends, and certain other reportable payments are generally required to withhold thirty percent (30%) of such payments if the payee fails to furnish such payee's correct taxpayer identification number (social security number or employer identification number), to the payor. The Trust may be required to withhold a portion of any payments made to a Holder of an Allowed Claim if the Holder (a) fails to furnish the correct social security number or other taxpayer identification number ("TIN") of such Holder, (b) furnishes an incorrect TIN, (c) has failed to properly to report interest or dividends to the IRS in the past, or (d) under certain circumstances, fails to provide a certified statement signed under penalty of perjury, that the TIN provided is the correct number and that such Holder is not subject to backup Withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

AS INDICATED ABOVE, THE FOREGOING IS INTENDED. TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING VVITH A TAX PROFESSIONAL. THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT SUCH HOLDER'S TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## V.  LIQUIDATION ANALYSIS

ISC's estate is comprised of essentially five classes of assets:  Real Estate, Operating Assets (including vehicles, rolling stock, trailers, equipment, furniture and fixtures, office equipment, software and hardware), Cash assets (A/R cash and equivalents, claims and rights of action including claims for voidable preferences and/or preferential transfers, and Inventory) and Goodwill or "Going Concern" value.  ISC has evaluated the prospects of recovery from all five of these classes of property.  ISC knows of no voidable preference payments or preferential transfers which may yield any positive recovery for the benefit of the estate and, therefore, does not intend to pursue any such assets except to the extent that they may serve as setoff to any claim against ISC.  All such assets are to be transferred to the Trustee of the ISCBM Post Confirmation Trust.  ISC's estimation of the value of all Estate Assets including Goodwill or Going Concern value is reflected in the attached "Liquidation Value" Exhibit "C".  The source of valuation data used to prepare the schedules are regularly published valuation guides, debtor's good faith assertion of value, and book value of A/R cash and equivalents adjusted for Debtor's actual experience in conducting auctions pre-petition.

Given the lack of contracts of employment, non-compete agreements, contracts of supply, exclusive dealing arrangements, or other formal arrangements with customers and vendors, ISC's management asserts that ISC has no, or de minimus, "Goodwill" Value when considered from a liquidation perspective.  ISC's management asserts that "Going Concern" value may only be realized by creditors and equity security holders in this matter if the Debtor actually continues to operate, thereby satisfying conditions precedant to pending sales contracts, and sells the company assets as provided in the Plan.  When applied to the valuations for saleable assets, ISC anticipates that liquidation of the company would result in only a partial dividend to Class 3 claim holders and no dividend to Class 4 and Class 5 claim holders.  The source of data which appears on the Liquidation Analysis attached for valuation of Good Will and Going Concern Value is derived by taking the differential between the liquidation value of the tangible assets of the business and the highest bids to date received for the entirety of the assets.  This figure may, as a result of the Auction process, increase.  Since, by the structure of this plan, any such increase derived from sale is payable to Class 4, and eventually, Class 5 claimants, an increase in Liquidation value does not change the relative values or equities of the Debtor's proposed disposition under this Plan.

See Attached Liquidation Analysis at Exhibit "C" entitled "Liquidation Analysis".

**VI.  RISK FACTORS.**

Failure to Operate at current levels.  The Company has sufficient cash and credit facility
to operate for a brief period of time between confirmation and closing.  If, due to fall off
in product demand, or restriction of credit facilities, the company is unable to reasonably
predict maintaining operational liquidity, the Debtor will move the court for permission
to consummate sales under 11 USC 363.  In this case, the net proceeds of any such sale
will be disbursed as per the terms of this Plan.

SIGNIFICANT LOSS FROM LIABILITY TO 3RD PARTY.   The Debtor maintains
liability insurance in amounts commensurate with industry norms to protect against
losses due to accident during its operations.  However, a claim in excess of the limits of
liability successfully prosecuted against the Debtor could result in the failure of the
Debtor and its operations and result in the liquidation of the Debtor.

FAILURE OF SUCCESSFUL BIDDERS TO CONSUMMATE TRANSACTIONS.  The
Plan will fail if both the winning bidder and back up bidders for each Lot fail to close and
consummate their Asset Purchase Agreements.  In such an event, it is likely that the
Debtor will seek to modify the Plan to accommodate a transfer of all assets of the Estate
to the ISCBM Post Confirmation Trust.  No provision has been inserted into the Plan to
govern this contingency as it appears remote that such an event will occur.

FAILURE OF THE BURNS FAMILY GROUP TO SUBMIT A QUALIFIED BID.  As
of the Date of this Disclosure Statement, the Burns Family Group has not submitted
materials to GulfStar which would demonstrate a financial capacity to close a
contemplated Family Reorganization Proposal.  If the Burns Family Group fails to either
submit a Proposal, or if the information the Group submits fails to meet the criteria
established in the Family Reorganization Proposal Procedures for a qualified bid, then the
recovery of creditors and equity security holders under this Plan will be limited to the
results of the Bidding and Sales Procedures – Drywall Division.

OTHERS.  The above list is not meant to be an exhaustive recitation of all variables or
future events that might influence the Debtor or its operations and result in a negative
outcome under the terms of the Plan.  Management has presented its good faith review of
the above risks as major risks requiring consideration in deciding to vote upon this Plan.

**VII.  STATEMENT OF SUPPORT.        In deciding how to cast your vote on the
Plan, you should consider that all statements contained in this Disclosure Statement
relating to the amount of the claims and availability of funds for distribution are**

**based on the best information available to ISC at this time, but they may be erroneous.   There are variables in this Plan and risks that are beyond the control of the Debtor.   In any event, since the likelihood of recovery by impaired classes in the event of liquidation is Nill, and since the ongoing operations of the reorganized Debtor followed by the planned going concern sale(s) are estimated to be sufficient to satisfy all Administrative, Priority and Secured claims against the estate and provide a recovery for General Unsecured Creditors, all class members of all classes may determine that the Plan is more advantageous than forcing immediate liquidation of ISC.  The Official Committee of Unsecured Creditors has authorized the Debtor to represent that it supports the Confirmation of the Plan.**

## VIII.  CONFIRMATION OF THE PLAN

VOTING

(d) A ballot to be used for voting to accept or reject the Plan is enclosed with a copy of this Disclosure Statement and mailed to claimants entitled to vote.  Before completing your ballot, please read carefully the instruction sheet that accompanies the ballot. The Bankruptcy Court has directed that, in order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received on or before _____, 2011.

(e) The holders of Allowed Claims and Equity Interests in Classes 3 through 5 are impaired under the Plan, and holders of the Claims and Interests in such Classes are entitled to vote with respect to the Plan. Classes 1, and 2 are not impaired under the Plan and are deemed to have accepted the Plan and therefore are not entitled to vote on the Plan.

(f) Subject to the Cram Down provision which follows, the Plan can only be confirmed if each impaired Class of Claims and each Class of Interests accepts the Plan.  A Class of Claims accepts the Plan if it is accepted by two-thirds in dollar amount and a majority in the number of holders of Allowed Claims (who cast a vote to acceptor reject the Plan) of each impaired class. A Class of Interests accepts the Plan if it is accepted by two thirds in dollar amount of Allowed Interests (who cast a vote to accept or reject the Plan) of each impaired class.

## IX.  CRAM DOWN PROVISIONS

If an impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court can nevertheless make the Plan binding upon the dissenting Class of Claims or Interests pursuant to the provisions of 11 U.S.C. §1129(b) so long as at least one impaired Class of Claims or Interests has accepted the Plan. The foregoing provision of the Bankruptcy Code is generally referred to as the "Cram Down" section because it makes either Plan binding on the dissenting, impaired Class of Claims. ISC has invoked the provisions of the Cram Down Section of the Bankruptcy Code and has requested the Court confirm the Plan notwithstanding a dissenting, impaired Class of Claims. However, Cram Down is not automatic and involves the finding by the court of additional facts and factors beyond those necessary in the event of an affirmative vote of

all Classes.  It is important that all Holders of Claims cast a vote.  ISC asserts that the vote should be in favor of the Plan.

## X.  CONFIRMATION STANDARDS

At the Confirmation hearing, the Bankruptcy Court must determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. As set forth in Section 1129 of the Bankruptcy Code, these requirements are as follows:

The Plan complies with the applicable provisions of the Code.

ISC complies with the applicable provisions of the Bankruptcy Code.

The Plan has been proposed in good faith and not by means forbidden by law.

All payments to be made for services or costs in connection with the case or in connection with the Plan and incident to the case have been approved by or are subject to the approval of the Bankruptcy Court as reasonable.

Adequate disclosure is made with respect to the identity and affiliation of any individual proposed to serve, after Confirmation of the Plan, as an officer or director of ISC.

The Plan satisfies the "best interests" of the creditors' test.

The Plan has been accepted by at least one Class of claims that is impaired under the Plan and as to any impaired Class that has not accepted the Plan, the Plan does not unfairly discriminate and is fair and equitable to holders in each Class.

The Plan satisfies the feasibility test.

ISC believes that the Plan meets or exceeds all applicable tests and, in particular, satisfies the "best interests" of the creditors' test.  The "best interests" test is met under the Plan if holders of all Allowed Claims and equity interests impaired under the Plan will receive payments under the Plan having a present value as of the Effective Date not less than the amounts likely to be received if ISC were liquidated in a case under Chapter 7 of the Bankruptcy Code. ISC believes that this test is met by the substantially better return to the holders of Allowed Claims under the Plan than under a Chapter 7 liquidation as described in this Disclosure Statement.

## XI.  OBJECTION TO CONFIRMATION

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a Plan. Any objection to confirmation of the Plan must be made in writing and must be filed with the Bankruptcy Court and served upon the following party on or before  _____ .


Donald Wyatt, Attorney for the Debtor
26418 Oakridge Drive

The Woodlands, Texas 77380

And the Office of the US Trustee.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## XII.  EFFECT OF CONFIRMATION

**THE PROVISIONS OF A CONFIRMED PLAN BIND ISC, CREDITORS AND EQUITY INTEREST HOLDERS, WHETHER THE PARTY'S CLAIM OR INTEREST IS IMPAIRED AND WHETHER THE PARTY VOTED FOR THE PLAN. THE PLAN CONSTITUTES A NEW CONTRACT BETWEEN ISC AND EACH OF THE PARTIES OF INTEREST PROVIDED FOR IN THE PLAN.  IN THE EVENT THAT THE FAMILY REORGANIZATION ALTERNATIVE IS THE SELECTED ALTERNATIVE, EACH OLD DEBT, CLAIM OR INTEREST AGAINST ISC SHALL BE DISCHARGED UNDER THE PROVISIONS OF 11 U.S.C. §1141(D) AND THE RIGHTS AND REMEDIES ATTENDANT TO SUCH OLD DEBTS AND CLAIMS WILL BE REPLACED BY THE RIGHTS AND REMEDIES OF THE HOLDERS OF SUCH DEBTS AND CLAIM PROVIDED FOR IN THE PLAN, THE BANKRUPTCY CODE THE BANKRUPTCY RULES.**

## XIII.  RECOMMENDATION

ISC STRONGLY URGES ALL HOLDERS OF CLAIMS IN IMPAIRED CLASSES TO VOTE TO ACCEPT THE PLAN.

Dated this $^{24th}$ Day of January, 2011.

ISC Building Materials, Inc.

By: _____

Allan Burns,

President.