**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

ISC ACQUISITION CORP.

AND

ISC BUILDING MATERIALS, INC.

Dated as of February 17, 2011

# TABLE OF CONTENTS

ARTICLE I. PURCHASE AND SALE OF ASSETS ................................................................ 1
  Section 1.1        Purchase and Sale of Assets.................................................................. 1
  Section 1.2        Retained Assets...................................................................................... 3
  Section 1.3        Assumed Liabilities............................................................................... 4
  Section 1.4        Excluded Liabilities............................................................................... 4
  Section 1.5        Purchase Price........................................................................................ 5
  Section 1.6        Adjustments to the Purchase Price......................................................... 6
  Section 1.7        Deposit.................................................................................................... 8
  Section 1.8        Removal of Certain Assumed Contracts................................................. 8
  Section 1.9        Prorations............................................................................................... 8

ARTICLE II. THE CLOSING ............................................................................................... 9
  Section 2.1        Closing.................................................................................................... 9
  Section 2.2        Payment of Purchase Price..................................................................... 9
  Section 2.3        Tax Treatment...................................................................................... 10

ARTICLE III. REPRESENTATIONS AND WARRANTIES OF THE SELLER ...................... 10
  Section 3.1        Organization......................................................................................... 10
  Section 3.2        Authority Relative to this Agreement ................................................... 10
  Section 3.3        Consents and Approvals ....................................................................... 11
  Section 3.4        No Violations........................................................................................ 11
  Section 3.5        Tangible Property.................................................................................. 11
  Section 3.6        Litigation.............................................................................................. 11
  Section 3.7        No Violation of Law ............................................................................. 12
  Section 3.8        Permits and Licenses............................................................................ 12
  Section 3.9        Title to and Use of Property.................................................................. 13
  Section 3.10       Accounts Receivable............................................................................. 13
  Section 3.11       Inventories............................................................................................ 13
  Section 3.12       Absence of Certain Changes or Events.................................................. 13
  Section 3.13       Assumed Contracts .............................................................................. 13
  Section 3.14       Employee Matters ................................................................................ 13
  Section 3.15       Tax Matters .......................................................................................... 13
  Section 3.16       No Implied Representation ................................................................... 14
  Section 3.17       Brokers ................................................................................................. 14

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ............. 14
  Section 4.1        Organization......................................................................................... 14
  Section 4.2        Authority Relative to this Agreement ................................................... 14
  Section 4.3        No Violations........................................................................................ 14
  Section 4.4        Consents and Approvals ....................................................................... 14
  Section 4.5        Brokers.................................................................................................. 15
  Section 4.6        Financing............................................................................................... 15

ARTICLE V. COVENANTS.................................................................................... 15
    Section 5.1     Conduct by the Seller Pending the Closing ...................................... 15
    Section 5.2     Access and Information .................................................................. 16
    Section 5.3     Bankruptcy Actions ....................................................................... 16
    Section 5.4     Tax Returns and Filings; Payment of Taxes .................................... 16
    Section 5.5     Transfer Tax Matters...................................................................... 16
    Section 5.6     Employment Matters...................................................................... 17
    Section 5.7     Additional Matters ........................................................................ 17
    Section 5.8     Names .......................................................................................... 18
    Section 5.9     Current Evidence of Title............................................................... 18

ARTICLE VI. POST-CLOSING COVENANTS ..................................................... 19
    Section 6.1     Further Assurances ........................................................................ 19
    Section 6.2     Books and Records; Personnel ....................................................... 19

ARTICLE VII. CONDITIONS PRECEDENT............................................................ 19
    Section 7.1     Conditions Precedent to Obligation of the Seller ............................ 19
    Section 7.2     Conditions Precedent to Obligation of the Purchaser ...................... 20

ARTICLE VIII. TERMINATION, AMENDMENT AND WAIVER ......................... 21
    Section 8.1     Termination by Either the Purchaser or the Seller ........................... 21
    Section 8.2     Termination by the Seller................................................................ 21
    Section 8.3     Termination by the Purchaser ......................................................... 21
    Section 8.4     Effect of Termination and Abandonment ........................................ 22
    Section 8.5     Break-Up Fee ................................................................................ 22

ARTICLE IX. DELIVERIES AT CLOSING............................................................. 22
    Section 9.1     Seller's Deliveries at Closing ......................................................... 22
    Section 9.2     Purchaser's Deliveries at Closing.................................................... 23
    Section 9.3     Required Documents ...................................................................... 23

ARTICLE X. GENERAL PROVISIONS ................................................................. 23
    Section 10.1    Notices ......................................................................................... 23
    Section 10.2    Descriptive Headings; Interpretation .............................................. 24
    Section 10.3    Entire Agreement; Assignment....................................................... 24
    Section 10.4    Governing Law .............................................................................. 25
    Section 10.5    Time is of the Essence ................................................................... 25
    Section 10.6    Venue and Retention of Jurisdiction................................................ 25
    Section 10.7    Expenses ....................................................................................... 25
    Section 10.8    Amendment................................................................................... 25
    Section 10.9    Counterparts; Effectiveness ............................................................ 25
    Section 10.10   Severability; Validity; Parties in Interest......................................... 25
    Section 10.11   Effectiveness ................................................................................. 26

ARTICLE XI. DEFINITIONS.................................................................................. 26
    Section 11.1    Defined Terms .............................................................................. 26

Exhibits

| | | |
|---|---|---|
| Exhibit A | -- | Sale Order |
| Exhibit 1.1(a) | -- | Owned Real Property |
| Exhibit 1.1(c) | -- | Included Tangible Property |
| Exhibit 1.1(d) | -- | Wallboard Inventory |
| Exhibit 1.1(e) | -- | Assumed Contracts |
| Exhibit 1.1(o) | -- | Accounts Receivable |

Schedules

Sellers Disclosure Schedule

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of February 17, 2011 (this "Agreement"), by and between, ISC Acquisition Corp., a Texas limited liability company (the "Purchaser"), and ISC Building Materials, Inc., a Texas corporation (the "Seller"). Capitalized terms used herein and not otherwise defined shall have the meanings set forth in Article XI hereof.

WHEREAS, Seller, operating out of facilities in Austin, Tyler, Dallas, Fort Worth, Houston, and San Antonio, Texas, is engaged in the business (the "Business") of supplying and transporting wallboard and related products used in the interior completion of residential and commercial construction products;

WHEREAS, Seller filed a voluntary petition (the "Petition") for relief commencing a case (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"); and

WHEREAS, the Purchaser desires to purchase and obtain the assignment from the Seller, and the Seller desires to sell, convey, assign, and transfer to the Purchaser, assets and properties of Seller, together with certain specified obligations and liabilities relating thereto, all in the manner and subject to the terms and conditions set forth herein and in accordance with Sales and Bidding Procedures proposed by Seller and filed as Document # 280-2 in Docket #10-35732.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, the Parties agree as follows:

## ARTICLE I.
## PURCHASE AND SALE OF ASSETS

Section 1.1    Purchase and Sale of Assets.    On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller shall sell, assign, transfer, convey, and deliver to the Purchaser, and the Purchaser shall purchase and accept from the Seller, all of Seller's rights, title, and interests in and to the Purchased Assets, free and clear of all Encumbrances, in each case other than Permitted Encumbrances. The term "Purchased Assets" means all the assets, properties, liens, lien rights, manufacturers' warranties and claims with respect to the Purchased Assets, whether real, personal or mixed, whether now existing or hereafter acquired, in each case, whether or not recorded or reflected or required to be recorded or reflected on the books and records or financial statements of the Seller, as the same shall exist at the Closing, that are specifically described in clauses (a) through (r) below (but shall specifically exclude the Retained Assets set forth in Section 1.2):

(a)    the real property located at the Seller's Tyler and Austin locations as more fully described on Exhibit 1.1(a) (the "Owned Real Property");

(b)     all fixtures and improvements constructed or installed by the Seller and located at the Owned Real Property or the Leased Real Property as of the date of this Agreement (the "Improvements");

(c)     all furniture, equipment and other tangible personal property (including transportation equipment, computers, servers and related equipment, communication equipment, alarms, security cameras, copiers, printers, fax machines, scanners, dollies, ladders, straps, spare parts, and office supplies) owned by Seller and currently located at the Owned Real Property or the Leased Real Property, including the items listed as set forth on Exhibit 1.1(c) (collectively, the "Included Tangible Property");

(d)     all inventories (including drywall, metal studs, ceiling tiles and grids, insulation, tools and related interior construction materials and supplies, but excluding lumber inventory and related products, such as dimension lumber, plywood, paneling and particle board) held by the Seller for resale in the Business (including raw materials, work-in-process and finished goods) in transit to or located at the Owned Real Property or the Leased Real Property (collectively, the "Wallboard Inventory");

(e)     all contracts, leases, licenses (including software licenses such as the Infor ERP SX.enterprise software package, DQ Technology's ODT system, Arsenault Associate's Dossier software, Sage's ABRA software, MaxRecall software and the full suite of Microsoft Office software) and agreements listed in Exhibit 1.1(e) (collectively, the "Assumed Contracts") and all rights and claims thereunder;

(f)     all labels, packing materials, product and descriptive literature and specification sheets utilized in the Business;

(g)     all technical, processing, manufacturing or marketing information utilized in the Business, all designs, engineering and other drawings, devices and related information and documentation utilized in the Business;

(h)     the name(s) "ISC Building Materials," "Insulation Supply Company" and "ISC," together with all derivatives thereof;

(i)     to the extent transferable and as included in the Assumed Contracts, all rights under all warranties, representations and guarantees made by suppliers, manufacturers and contractors in connection with the other Purchased Assets described in this Section 1.1;

(j)     all rights under confidentiality, nondisclosure and similar agreements to the extent transferable, included in the Assumed Contracts and related to the Purchased Assets or the Hired Employees;

(k)     all books and records of the Seller that relate primarily to the Purchased Assets or the Hired Employees, including data processing records, employment and personnel records, records relating to suppliers, supplier lists, cost information, vendor data, specifications and drawings, correspondence and lists, product literature, artwork, design, development and manufacturing files, quality records and other data; provided, however, the Seller, and any Trustee of any Liquidating Trust becoming successor in interest to the Seller, may retain copies of

(x) all books and records included in the Purchased Assets to the extent necessary or useful for the administration of the Chapter 11 Case or any other Action to which it is a party, the filing of any Tax Return or compliance with any applicable laws and (y) all personnel records;

(l)     all domain name registrations (including without limitation "www.ISCBM.com"), telephone and facsimile numbers utilized at the Owned Real Property or the Leased Real Property as of the date of this Agreement, patents, trademarks, trademark rights, copyrights, trade styles, and service marks and all applications (pending or in process) and registrations therefor used in the Business as listed in Exhibit 1.1(l), if any (collectively, the "Intellectual Property");

(m)     to the extent not part of the Intellectual Property, all operations, manuals, methods and procedures, to the extent owned by Seller, and to the extent the same relate to the Purchased Assets (the "Know How");

(n)     any and all final construction drawings and plans and specifications for the Owned Real Property, the Leased Real Property or the Improvements (the "Construction Drawings");

(o)     all accounts and notes receivable relating to the Business (the "Accounts Receivable");

(p)     all Customer Information that relates primarily to the Purchased Assets or the Business; and

(q)     all rights, causes of action and claims relating to the Purchased Assets or the Assumed Liabilities (as defined in Section 1.3 below).

Section 1.2     Retained Assets.  The following assets, properties, and rights (the "Retained Assets") are not included in the Purchased Assets and shall be retained by the Seller:

(a)     the capital stock of and membership interests in either Seller or any direct or indirect subsidiary of the Seller;

(b)     all cash, cash equivalents, cash in transit and cash collateralizing letters of credit or bank or other financial accounts of the Seller;

(c)     any claims, rights or causes of action arising under Sections 544 through 553, inclusive, of the Bankruptcy Code and any right, title and interest in and to any pending litigation, including, but not limited to, M. Christopher Homes v. ISC Building Materials, Inc.;

(d)     all refundable operating deposits made with third parties after commencement of the Chapter 11 Case;

(e)     any interest in and to any refund of Taxes of the Seller for any period and any interest in and to any refund of Taxes relating to the Purchased Assets or the Business for, or applicable to, the Pre-Closing Tax Period;

3

(f)    all credits, claims for refund, prepaid expenses, deferred charges, advance payments, security or other deposits, including recoverable deposits, and prepaid items (and, in each case, security interests relating thereto) arising from or in connection with, or related to, the Assumed Contracts or, any other Purchased Assets;

(g)    all claims or rights against any Person arising primarily from the ownership of any Asset (except the Accounts Receivable) prior to the Closing Date;

(h)    all rights, claims, proceeds and causes of action under insurance policies and all rights in the nature of insurance, indemnification or contribution relating to the Business, Purchased Assets or Assumed Liabilities arising prior to the Closing Date;

(i)    all of the Seller's rights under this Agreement and any other agreement to sell assets of the Seller now existing or in the future and all cash and non-cash consideration payable or deliverable to the Seller pursuant to the terms and provisions hereof and thereof;

(j)    all books and records of the Seller that do not relate primarily to the Purchased Assets or the Hired Employees, including all stock record books and minute books of the meetings of the shareholders of the Seller and the boards of directors of the Seller, financial statements, and accounting and tax ledgers, records and work-papers; provided that Purchaser shall be entitled to copies of all books and records that relate primarily to the Purchased Assets or Hired Employees;

(k)    all rights, causes of action and claims relating to Retained Assets or Excluded Liabilities; and

(l)    any other asset, property, right, contract or claim owned by the Seller and not included in the definition of Purchased Assets, and specifically including the Seller's "closed" locations in Waco, Huntsville, Prosper, Longview, Waxahachie and College Station, the Seller's Ennis location (the "lumber yard"), lumber inventory and related products (such as dimension lumber, plywood, paneling and particle board).

Section 1.3    Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall assume and accept assignment from the Seller and thereafter pay, perform or discharge in accordance with their terms the following obligations of the Seller (the "Assumed Liabilities"), without duplication (a) the obligations of the Seller under the Assumed Contracts that, by the terms of such Assumed Contracts, arise after Closing and relate to periods following the Closing and that are to be observed, paid, discharged or performed, as the case may be, in each case, at any time after the Closing Date; and (b) all Taxes relating to the Business or the Purchased Assets acquired by the Purchaser hereunder and that arise or relate to the period or portion thereof beginning on the day after the Closing Date and Property Taxes which are not yet due and payable attributable to periods before or after the Closing Date.

Section 1.4    Excluded Liabilities.  Notwithstanding anything to the contrary contained herein, the Purchaser shall not assume, or in any way be liable or responsible for, any liabilities, commitments or obligations, whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed or otherwise, of the Seller, including, without limitation, all

4

liabilities, commitments or obligations relating to or arising from the Purchased Assets or the use thereof, except for those that are the Assumed Liabilities (the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Purchaser shall not assume, and the Seller shall remain responsible for, the following liabilities, commitments or obligations, whether known or unknown, disclosed or undisclosed, absolute, contingent, fixed or otherwise (all of which shall be Excluded Liabilities):

(a)     except as specifically provided in Section 1.3, any liabilities, commitments or obligations that arise with respect to the Purchased Assets or the use thereof on or prior to the Closing Date or relate to periods on or prior to the Closing Date or are to be observed, paid, discharged or performed on or prior to the Closing Date (in each case, including any liabilities that result from, relate to or arise out of tort or other product liability claims);

(b)     except as otherwise provided herein including Sections 1.3 and 5.5, any liability, commitment or obligation for any Taxes relating to the Business or the Purchased Assets for or applicable to the Pre-Closing Tax Period, including any Property Taxes and any liability, commitment or obligation for any Transfer Taxes (any liability, commitment or obligation set forth in this clause (b), "Excluded Taxes"); and

(c)     any liability or obligation of any kind under any contract, lease, license or agreement that is not an Assumed Contract, including without limitation any and all liability under or relating to the Seller's "closed" locations in Waco, Huntsville, Prosper, Longview, Waxahachie and College Station, the Seller's Ennis location (the "lumber yard"), whether arising before or after the Closing or otherwise.

Section 1.5     Purchase Price.  Subject to adjustment in accordance with Section 1.6 below and the approval of the Bankruptcy Court,

(a)     The purchase price for the Purchased Assets shall be (i) $4,000,000.00 (the "Purchase Price") and (ii) the assumption of the Assumed Liabilities, and shall be paid in accordance with Section 2.2.

(b)     The Purchaser and the Seller agree that the allocation of the Purchase Price (the "Allocation") shall be as follows:

(i)     The Purchased Assets described in Section 1.1(a) and (b) are allocated a value of $800,000.00 ($600,000.00 of which is allocated for the Owned Real Property and Improvements located in Austin, Texas and $200,000.00 of which is allocated for the Owned Real Property and Improvements located in Tyler, Texas) (the "Owned Real Estate Value").

(ii)     The Purchased Assets described in Section 1.1(c) are allocated a value of $750,000.00 (the "Included Tangible Property Value"); and

(iii)     The Purchased Assets described in Section 1.1(d) are allocated a value of $900,000.00 (the "Inventory Value");

(iv)    The Purchased Assets described in Section 1.1(o) are allocated a value of $1,500,000.00 (the "Accounts Receivable Value"); and

(v)    The Purchased Assets described in Section 1.1(e), (f), (g), (h), (i), (j), (k), (l), (m), (n), (p) and (q) are allocated a value of $50,000.00 (the "Included Tangible Property Value").

Section 1.6    Adjustments to the Purchase Price.

(a)    Accounts Receivable.

(i)    The Seller shall, two (2) business days prior to the Closing Date, prepare or cause to be prepared a statement (the "Estimated Closing Accounts Receivable Statement"), reflecting the Accounts Receivable Value on the Closing Date (net of payment discounts). The Estimated Closing Accounts Receivable Statement shall be prepared to show the estimated amounts as of the Closing Date of (w) all receivables owed to the Seller the invoices for which are dated, as of the Closing Date, not earlier than the fifteenth day of the third calendar month prior to the Closing Date; (x) all receivables owed to the Seller the invoices for which are dated, as of the Closing Date, not earlier than the fifteenth day of the fourth calendar month prior to the Closing Date; (y) all receivables owed to the Seller by public entities which are covered by a bond and are evidenced by invoices which are dated no more than ninety (90) days prior to the Closing Date and for which copies of the relevant bonds and satisfactory evidence that all required lien steps have been followed by the Seller are attached; and (z) all other receivables owed to the Seller as of the Closing Date. The Purchaser shall within fourteen (14) calendar days after the Closing Date prepare or cause to be prepared a statement (the "Closing Accounts Receivable Statement") reflecting the Accounts Receivable Value as of the Closing Date (the "Final Accounts Receivable Value") and the calculation thereof and shall deliver such Closing Statement to the Seller or the Trustee of any Liquidating Trust established as a result of the Confirmation of a Plan of Reorganization applicable to the Seller. The Final Accounts Receivable Value shall be calculated as follows: (I) seventy-five (75%) percent of the aggregate amount of the receivables described in subsection (w) in the Estimated Closing Accounts Receivable Statement, (II) seventy-five (75%) percent of the aggregate amount of receivables described in subsection (x) of the Estimated Closing Accounts Receivable Statement; (III) seventy-five (75%) percent of the aggregate amount of the receivables described in subsection (y) of the Estimated Closing Accounts Receivable Statement; and (IV) fifty (50%) percent of the aggregate amount of the receivables described in subsection (z) of the Estimated Closing Accounts Receivable Statement. The Purchaser shall provide the Seller with access to copies of all work papers and other relevant documents to verify the information contained in the Closing Accounts Receivable Statement. The Seller shall have a period of ten (10) calendar days after delivery to it of the Closing Accounts Receivable Statement to review it and make any objections in writing to the Purchaser. If written objections to the Closing Accounts Receivable Statement are delivered to the Purchaser within such 10-day period, then the Seller and the Purchaser shall attempt to resolve the matter or matters in dispute. If no written objections are made within the time period provided above, the Closing Accounts Receivable Statement shall become final

and binding on the Parties and the Purchase Price shall be adjusted as described in clause (e) below.

     (b)     Inventory.

     (i)     The Seller shall, two (2) business days prior to the Closing Date, prepare or cause to be prepared a statement (the "Estimated Closing Inventory Statement"), reflecting the Wallboard Inventory Value (based on the cost paid by Seller for the Wallboard Inventory) on the Closing Date.

     (ii)     The Purchaser shall within fourteen (14) calendar days after the Closing Date prepare or cause to be prepared a statement (the "Final Closing Inventory Statement") reflecting the Inventory Value (net of any missing, spoiled, damaged inventory, or any non-saleable inventory, determined in Purchaser's discretion), calculated at Seller's actual cost and based on a physical count of all items described in Section 1.1(d), as of the Closing Date (the "Final Inventory Value") and the calculation thereof and shall deliver such Closing Statement to the Seller or the Trustee of any Liquidating Trust established as a result of the Confirmation of a Plan of Reorganization applicable to the Seller. The Purchaser shall provide the Seller with access to copies of all work papers and other relevant documents to verify the information contained in the Final Closing Inventory Statement. The Seller shall have a period of ten (10) calendar days after delivery to it of the Final Closing Inventory Statement to review it and make any objections in writing to the Purchaser. If written objections to the Final Closing Inventory Statement are delivered to the Purchaser within such 10-day period, then the Seller and the Purchaser shall attempt to resolve the matter or matters in dispute. If no written objections are made within the time period provided above, the Final Closing Inventory Statement shall become final and binding on the Parties and the Purchase Price shall be adjusted as described in clause (e) below.  For purposes of this subsection, "non-saleable inventory" shall mean inventory Purchaser determines, in good faith, is not merchantable as that term is used in the Texas Uniform Commercial Code.

     (c)     Included Tangible Property.

     (i)     The Purchaser shall within seven (7) calendar days after the Closing Date prepare or cause to be prepared a statement (the "Closing Included Tangible Property Statement") reflecting the Included Tangible Property Value as of the Closing Date (net of the value of any Included Tangible Property not located at the Owned Real Property or Leased Real Property as of the Closing Date, determined in Purchaser's discretion) (the "Final Included Tangible Property Value") and the calculation thereof and shall deliver such Closing Statement to the Seller or the Trustee of any Liquidating Trust established as a result of the Confirmation of a Plan of Reorganization applicable to the Seller. The Purchaser shall provide the Seller with access to copies of all work papers and other relevant documents to verify the information contained in the Closing Included Tangible Property Statement. The Seller shall have a period of ten (10) calendar days after delivery to it of the Closing Included Tangible Property Statement to review it and make any objections in writing to the Purchaser. If written objections to the Closing Included Tangible Property Statement are delivered to the Purchaser within such 10-day

period, then the Seller and the Purchaser shall attempt to resolve the matter or matters in dispute. If no written objections are made within the time period provided above, the Closing Included Tangible Property Statement shall become final and binding on the Parties and the Purchase Price shall be adjusted as described in clause (e) below.

(d)     If disputes with respect to the Closing Accounts Receivable Statement, Closing Inventory Statement, or Closing Included Tangible Property Statement (each a "Closing Statement") cannot be resolved by the Purchaser and the Seller within ten (10) calendar days after the delivery of the objections to the applicable Closing Statement as provided herein, then either party with notice to the other party may submit the specific matters in dispute to the Bankruptcy Court for determination.

(e)     At the time the applicable Closing Statement becomes final and binding on the Parties, the Purchase Price will be reduced by the amount, if any, by which (A) the Accounts Receivable Value exceeds the Final Accounts Receivable Value, (B) the Inventory Value exceeds the Final Inventory Value, and (C) the Included Tangible Property Value exceeds the Final Included Tangible Property Value.

Section 1.7    Deposit.   Upon execution and delivery of this Agreement by the Purchaser and the Seller, the Purchaser shall pay into escrow by wire transfer of immediately available funds a deposit in an amount equal to the amount required under the terms of the Sales and Bidding Procedures (the "Deposit"). Pending the earlier to occur of Closing or termination of this Agreement under Article VIII, the Deposit shall be held in escrow with Seller's representative, Gulfstar Group II, Ltd. ("Escrow Agent"), under that certain Deposit Escrow Agreement ("Deposit Escrow Agreement"), dated of even date herewith, by and among Purchaser, Seller and Escrow Agent.   At the Closing, the Deposit shall be applied toward payment of the Purchase Price and the remainder of the Purchase Price shall be payable at the Closing in the manner provided in Section 2.2.

Section 1.8    Removal of Certain Assumed Contracts.   Between the date of this Agreement and the date that the Sale Order is entered and becomes effective, the Purchaser may remove contracts or agreements from the list of Assumed Contracts set forth on Exhibit 1.1(e) ("Removal"); provided that (a) there shall be no adjustment to the Purchase Price as a result of any Removal, and (b) the Purchaser shall reimburse the Seller and its estate for any and all costs or expenses associated with any Removal arising from the date hereof until the date occurring twenty (20) calendar days after the Seller has received notice from the Purchaser of such Removal. Upon proper Removal of Assumed Contracts pursuant to the terms of this Section 1.8, the Purchaser shall not assume any liability with respect to such Assumed Contracts so rejected. Any such Removal shall result in a change in which agreements and contracts constitute Assumed Contracts for all purposes of this Agreement.

Section 1.9    Prorations.   Seller shall be responsible for and shall pay all personal property taxes, ad valorem taxes and assessments which are past due or have become due with respect to any of the Purchased Assets on or before the Closing Date, together with any penalty or interest thereon.  Seller and Purchaser shall cause to be prorated through the Closing Date all applicable personal property taxes and ad valorem taxes arising with respect to the Purchased Assets for the current assessment period and not yet due as of the Closing Date.

Purchaser shall, at Closing, deduct from the Purchase Price otherwise due to Seller at Closing hereunder an amount equal to the Seller's prorated portion of such taxes, and Purchaser thereafter shall timely pay such amount to the appropriate taxing authority as an Assumed Liability under Section 1.3. If current tax bills are not available as of the Closing Date, the prior year's tax bills will be used for purposes of making a tentative proration at the Closing, and a final proration shall be made promptly when the current tax bills are received. Seller shall remit any additional amounts due to Purchaser within ten (10) calendar days of receipt of written notice thereof from Purchaser (which notice shall include reasonable evidence of the taxes owed and a statement of the amount claimed of Seller). Purchaser shall remit to the Seller any excess amounts previously paid by Seller (as well as reasonable evidence of the taxes owed and a statement regarding the excess amounts) promptly upon receiving the current year's tax bills and determining the amount of such excess.

## ARTICLE II.
## THE CLOSING

Section 2.1    Closing.    The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Chamberlain Hrdlicka White Williams & Martin, 1200 Smith Street, Suite 1400, Houston, Texas 77002 at 10:00 a.m. on the fifth (5th) Business Day after the conditions set forth in Sections 7.1 and 7.2 shall have been satisfied or waived, or at such other time, date and place as shall be fixed by agreement among the Parties (the date of the Closing being herein referred to as the "Closing Date") or any other time, place and date as specified in any Sale Order entered by the Bankruptcy Court or, alternatively, in any Confirmed Plan of Reorganization in Seller's Bankruptcy Case.

Section 2.2    Payment of Purchase Price.    Subject to the terms and conditions hereof, the Purchaser shall:

(a)    pay to the Seller at the Closing, by wire transfer of immediately available funds to an account or accounts specified in writing not less than three (3) Business Days prior to the Closing by the Seller, the Purchase Price, less (i) the amount of the Deposit, (ii) the amount of $500,000.00 (the "Accounts Receivable Holdback"), (iii) the amount of $200,000.00 (the "Inventory Holdback"), (iv) the amount of $200,000.00 (the "Equipment Holdback") and (v) the amount of Seller's taxes and assessments prorated under Section 1.9;

(b)    deposit into an escrow account established by Purchaser the amounts of the Accounts Receivable Holdback, the Inventory Holdback and the Equipment Holdback (collectively, the "Holdback") for a period of fourteen (14) calendar days after the Closing in the case of the Accounts Receivable Holdback, fourteen (14) calendar days after the Closing in the case of the Inventory Holdback, and seven (7) calendar days after the Closing in the case of the Equipment Holdback (each a "Holdback Period") for purposes of making the adjustments described in Section 1.6, if any, during the relevant Holdback Period;

(c)    assume as of the Closing the Assumed Liabilities pursuant to one or more duly executed Assignment and Assumption Agreements, in customary form mutually agreeable to the Parties; and

(d)     pay to the Seller, or authorize release from the Escrow Account established under subsection (c) above, up to the maximum amounts of the Allocation in subsections 1.5(b)(ii)–(iv), the difference between (i) the Included Tangible Property Value and the Final Included Tangible Property Value; (ii) subject to subsection (e) below, the difference between the Final Accounts Receivable Value and the Accounts Receivable Value set forth on the Estimated Closing Accounts Receivable Statement; and (iii) the difference between the Final Inventory Value and the Inventory Value set forth on the Closing Inventory Statement.

(e)     pay fifty (50%) percent of all amounts (net of third-party costs of collection) collected by Purchaser after the Closing Date with respect to the receivables listed under subsection (V) of the Closing Accounts Receivable Statement, in each case within fifteen (15) days after the end of the calendar month in which such amounts are collected.

Section 2.3     Tax Treatment.  The Purchaser and the Seller agree to file all Tax Returns (such as IRS Form 8594 or any other forms or reports required to be filed pursuant to Section 1060 of the Code or any comparable provisions of United States local or state or foreign law ("Section 1060 Forms")) in a manner that is consistent with the Allocation and to refrain from taking any position inconsistent with the Allocation. Purchaser and Seller agree to cooperate in the preparation of any such Section 1060 Forms and to timely file such Section 1060 Forms in the manner required by applicable law.

# ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Purchaser as follows:

Section 3.1     Organization.  The Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Texas, and has the requisite power and authority to own, use, and operate its properties and to carry on its business as it is now being conducted or presently proposed to be conducted. The Seller is duly qualified as a foreign corporation to do business, and is in good standing, in each jurisdiction where the character of its properties owned or held under lease or the nature of its activities makes such qualification necessary, except where the failure to be so qualified could not have a Material Adverse Effect.  The Seller does not, directly or indirectly, own any equity or similar interest in, or any interest convertible into or exchangeable or exercisable for, any equity or similar interest in, any Person.

Section 3.2     Authority Relative to this Agreement.  Subject to the entry of an order approving Sales and Bidding Procedures followed by entry of a Sale Order, or alternatively, Confirmation of a Plan or Reorganization authorizing sale under this contract will have the Seller has the requisite power and authority (including contract limitations, corporate power and authority) to enter into this Agreement and to carry out its obligations hereunder. The execution, delivery, and performance of this Agreement by the Seller and the consummation by the Seller of the Contemplated Transactions have been duly authorized by all requisite corporate actions thereof. Subject to the entry and effectiveness of the Sale Order, this Agreement has been duly and validly executed and delivered by the Seller, and constitutes the legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

Section 3.3    Consents and Approvals. Except as set forth in Section 3.2 above and 3.3 of the Seller Disclosure Schedule, no material consent, approval, authorization of, declaration, filing, or registration with, any Governmental Authority or any other Person is required to be made or obtained by the Seller in connection with the execution, delivery, and performance of this Agreement and the consummation of the Contemplated Transactions, except for consents, approvals, authorizations of, declarations, or filings with the Bankruptcy Court including without limitation the Sale Order.

Section 3.4    No Violations. Neither the execution, delivery, or performance of this Agreement by the Seller, nor the consummation by the Seller of the Contemplated Transactions, nor compliance by the Seller with any of the provisions hereof will, directly or indirectly (with or without notice or lapse of time):

(a)    breach (A) any provision of the governing documents of the Seller or (B) any resolution(s) adopted by the board of directors of the Seller or by the shareholders of the Seller;

(b)    breach or give any Governmental Authority or other Person the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief under any legal requirement or order to which the Seller or any of the Purchased Assets is subject;

(c)    contravene, conflict with or result in a violation or breach of any of the terms or requirements of, or give any Governmental Authority the right to revoke, withdraw, suspend, cancel, terminate or modify any governmental authorization that is held by the Seller or that otherwise relates to the Purchased Assets or to the business of the Seller;

(d)    cause Purchaser to become subject to, or to become liable for the payment of, any Tax;

(e)    breach any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any Assumed Contract; or

(f)    result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on any Asset.

Section 3.5    Tangible Property. The Included Tangible Property included in the Purchased Assets are in good operating condition and repair in accordance with industry standards (normal wear and tear excepted) and are suitable for their use as used by the Seller in the Business as of the date hereof and, with respect to any equipment included within the Included Tangible Property, registered pursuant to the applicable requirements referenced in Section 3.8 below. Except as set forth in Section 3.5 of the Seller Disclosure Schedule, all Included Tangible Property material and necessary to the Business of the Seller as of the date hereof are included in Exhibit 1.1(c).

Section 3.6    Litigation. There is no pending Legal Proceeding by or against Seller or that relates to or may affect any of the Purchased Assets, or that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with any of the

11

Contemplated Transactions. There is no judgment, decree, injunction, rule, or order of any Governmental Authority or arbitrator pending against the Seller that is seeking to enjoin or prevent the Contemplated Transactions.

Section 3.7   No Violation of Law. Except to the extent excused by or unenforceable as a result of the commencement or pendency of the Chapter 11 Case or the application of any provision of the Bankruptcy Code, the Seller is not in material violation of, or has been given notice of or been charged with any material violation of, any law, statute, order, rule, regulation, ordinance, or judgment of any Governmental Authority (including, without limitation, those related to pollution, environmental protection and occupational safety and health) any insurance company or fire rating agency, or any other similar board, organization or authority, which violation would result in a Material Adverse Effect except any pending investigation of permit action pertaining to occupancy of the Dallas premises, a third party owned facility. Except as could not result in a Material Adverse Effect and except for the Chapter 11 Case, no investigation or review by any Governmental Authority of the Seller's Business is pending or, to the Seller's knowledge, threatened.

(b)    There are no known past or present events, conditions, circumstances, activities, practices, incidents, plans or actions, based on or resulting from the conduct of the business of the Seller or the Business, including, without limitation, the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling, or the emission, discharge, release, or threatened release into the environment, of any pollutant, contaminant, chemical, or industrial toxic or hazardous material, substance or waste, that violate any laws or the regulations thereunder currently in effect relating to pollution or protection of the environment ("Environmental Laws"), including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), or any plan, order, decree, judgment, injunction, notice or demand letter from a governmental department, commission, agency or instrumentality applicable to the Seller, or that could give rise to any common law or other legal liability. None of the Owned Real Property or the Leased Real Property is known to contain any spill, deposit, or discharge of any hazardous substance (as that term is currently defined under CERCLA or any applicable state law), for which the Seller could be liable.

(c)    Section 3.7 of the Seller Disclosure Schedule sets forth a complete and accurate description of each underground storage tank of any kind or nature that is located on the Owned Real Property or the Leased Real Property, as well as a complete history of each such underground storage tank, including the dates and types of all tests.

(d)    The Seller has listed in Section 3.7 of the Seller Disclosure Schedule and has delivered to Purchaser copies of all existing environmental site audits in the possession of the Seller that relate to the Owned Real Property or the Leased Real Property.

Section 3.8   Permits and Licenses. The Seller has obtained and listed in Section 3.8 of the Seller Disclosure Schedule those licenses, permits, certificates, franchises, consents, waivers, registrations or other regulatory authorizations that Seller has deemed are necessary for the Business or ownership of the Purchased Assets from the appropriate Governmental Authority in each applicable jurisdiction (the "State Licenses").

Section 3.9    Title to and Use of Property. Except as set forth in Section 3.10 of the Seller Disclosure Schedule, at the Closing, the Purchaser will acquire good and marketable title in and to all of the Purchased Assets, in each case, free and clear of any and all Encumbrances other than Permitted Encumbrances and, with respect to Assumed Contracts, subject to the Purchaser's obligations under Section 1.3. Seller will not provide Purchaser with any releases of Encumbrances other than the Sale Order.

Section 3.10    Accounts Receivable. All Accounts Receivable that are reflected on the accounting records of Seller as of the Closing Date represent or will represent valid obligations arising from sales actually made or services actually performed by Seller in the ordinary course of the Business.

Section 3.11    Inventories. All items included in the Wallboard Inventories are merchantable. Seller is not in possession of any inventory not owned by Seller, including goods already sold.

Section 3.12    Absence of Certain Changes or Events.

Section 3.13    Assumed Contracts. Except as set forth on Section 3.12 of the Seller Disclosure Schedule: each Assumed Contract is in full force and effect and is valid and enforceable in accordance with its terms; is assignable by Seller to Purchaser without the consent of any other Person; Seller is, and at all times has been, in compliance with all applicable terms and requirements of each Assumed Contract; each other Person that has or had any obligation or liability under any Assumed Contract is, and at all times has been, in full compliance with all applicable terms and requirements of such Assumed Contract; and no event has occurred or circumstance exists that (with or without notice or lapse of time) may contravene, conflict with or result in a breach of, or give Seller or another Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any Assumed Contract.

Section 3.14    Employee Matters. Section 3.13 to the Seller Disclosure Schedule is a true and complete list of all employees of Seller, and their dates of hire, positions, base salary and commission and bonus schedule (if applicable). Except as set forth on Section 3.13 to the Seller Disclosure Schedule, none of such employees has any agreement (written or otherwise) with Seller. Seller does not have any collective bargaining or union contracts or agreements and there is no union campaign presently being conducted to solicit employees to authorize a union to request a national labor relations board certification election with respect to any of Seller's employees.

Section 3.15    Tax Matters. Seller has (i) filed, when due, with all appropriate governmental agencies, all tax returns, estimates, reports and statements required to be filed by it, all of which are true and correct, and (ii) paid, when due and payable, all requisite income taxes, sales, use, property and transfer taxes, levies, duties, licenses and registration fees and charges of any nature whatsoever and workers' compensation premiums and unemployment taxes, including interest and penalties thereon. Seller has withheld all tax required to be withheld under applicable tax laws and regulations, and such withholdings have either been paid to the

respective governmental agencies or set aside in accounts for such purpose or accrued, reserved against and entered upon the books of Seller.

Section 3.16   <u>No Implied Representation</u>.   Notwithstanding anything to the contrary contained in this Agreement, it is the explicit intent of each Party hereto that the Seller is making no representation or warranty whatsoever, express or implied, except those representations and warranties contained in this Agreement. It is understood that, except to the extent otherwise expressly provided herein, the Purchaser takes the Purchased Assets "as is" and "where is." It is hereby acknowledged that the Seller makes no other representations and warranties, including without limitation any implied representation and warranty as to condition, merchantability, as to any of the Purchased Assets.

Section 3.17   <u>Brokers</u>.   Except as reflected within the docket of the Bankruptcy Court with respect to the retention of Gulfstar Group II, Ltd., no broker, investment banker, financial advisor or other person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission from the Purchaser in connection with the Contemplated Transactions based upon arrangements made by or on behalf of the Seller. All payments due to Gulfstar Group II, Ltd. shall remain solely the responsibility of the Seller and its estate.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Seller as follows:

Section 4.1   <u>Organization</u>. The Purchaser is a limited liability company validly existing and in good standing under the laws of the State of Texas.

Section 4.2   <u>Authority Relative to this Agreement</u>.   The Purchaser has the power and authority to enter into this Agreement and to carry out its obligations hereunder. The execution, delivery, and performance of this Agreement by the Purchaser and the consummation by the Purchaser of the Contemplated Transactions have been duly authorized by all requisite actions. This Agreement has been duly and validly executed and delivered by the Purchaser, and (assuming this Agreement constitutes a valid and binding obligation of the Seller) constitutes a valid and binding agreement of the Purchaser, enforceable against the Purchaser in accordance with its terms.

Section 4.3   <u>No Violations</u>. The execution, delivery and performance of this Agreement will not (a) violate any provision of the certificate of formation or company agreement or similar organizational instrument of the Purchaser or any of its Affiliates, or (b) violate or conflict with any statute, rule or regulation applicable to the Purchaser, any of its Affiliates or any of their properties or assets or any other material restriction of any kind or character to which the Purchaser or any of its Affiliates is subject that would prohibit or make unlawful the Contemplated Transactions.

Section 4.4   <u>Consents and Approvals</u>.   No material consent, approval, authorization of, declaration, filing, or registration with, any Governmental Authority is required to be made or obtained by the Purchaser in connection with the execution, delivery, and performance of this Agreement and the consummation of the Contemplated Transactions, except

such consents, approvals, authorizations of, declarations, or filings, the failure to obtain or make which would not, individually or in the aggregate, have an adverse effect on the Purchaser's ability to consummate the Contemplated Transactions.

Section 4.5    Brokers. No broker, investment banker, financial advisor or other person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission from the Seller in connection with the Contemplated Transactions based upon arrangements made by or on behalf of the Purchaser.

Section 4.6    Financing. The Purchaser represents that as of the date hereof it has, and on the Closing Date it will have, access to sufficient funds to deliver the Purchase Price to the Seller and to consummate the transactions contemplated hereby. THE PURCHASER REPRESENTS AND WARRANTS TO THE SELLER THAT THERE IS NO FINANCING CONTINGENCY OR CONDITION WITH RESPECT TO THE PURCHASER'S OBLIGATIONS TO PROCEED WITH CLOSING THE CONTEMPLATED TRANSACTIONS.

## ARTICLE V.
## COVENANTS

Section 5.1    Conduct by the Seller Pending the Closing. The Purchaser acknowledges and agrees that except with respect to maintaining the Purchased Assets prior to the Closing Date, the Seller may take all other actions in the conduct of its Business including (i) rejecting any and all unexpired leases and contracts other than the Assumed Contracts, (ii) selling or otherwise disposing of assets other than the Purchased Assets, (iii) terminating employees, consultants or advisors and (iv) altering or terminating relationships with third parties; provided, however, that with regard to items (iii) and (iv), Seller shall not take such actions without providing the Purchaser with ten (10) calendar days prior written notice. Notwithstanding the foregoing, except as otherwise expressly contemplated under this Agreement, from the date that Purchaser is announced as the "Stalking Horse" bidder under the Sales and Bidding Procedures until the Closing Date, without the prior written consent of the Purchaser:

(a)    the Seller shall not lease, license, surrender, relinquish, encumber or dispose of any Purchased Assets other than the disposition of obsolete or damaged Purchased Assets in the ordinary course of the Business;

(b)    the Seller shall continue to honor and perform the Assumed Contracts, shall not waive any rights thereunder, and shall not terminate, amend, modify or supplement the terms thereof without the express written permission of Purchaser, in the case of real estate leases which constitute Assumed Contracts and, with respect to all other Assumed Contracts, prior written notice to Purchaser; and

(c)    except to the extent necessary to comply with the requirements of applicable laws, regulations or Bankruptcy Court orders, the Seller shall (i) conduct the Business only in the ordinary course of the Business, (ii) not take, agree, or commit to take, any action that would make any representation or warranty of the Seller hereunder materially inaccurate in any

respect at, or as of any time prior to, the Closing Date, (iii) not omit, or agree or commit to omit, to take any action necessary to prevent any such representation or warranty from being materially inaccurate in any respect on the Closing Date or (iv) not take, agree, or commit to take, any action that would result in, or is reasonably likely to result in, any of the conditions set forth in Article VII not being satisfied.

Section 5.2    Access and Information.  Once accepted as the Stalking Horse bid, and upon approval by the Bankruptcy Court of the Sales and Bidding Procedures, the Seller shall afford to the Purchaser and to the Purchaser's financial advisors, legal counsel, accountants, consultants, financing sources, and other authorized representatives reasonable access (including, without limitation, access for the purposes of conducting surveys of the Owned Real Estate and Leased Real Estate and environmental assessments or testing) during normal business hours and without material disruption to the Business or operations of the Seller throughout the period prior to the Closing Date to all its books, documents, records, properties, plants, and personnel that relate to the Purchased Assets or Assumed Liabilities, and all other information as the Purchaser reasonably may request in furtherance of the Contemplated Transactions. The Purchaser shall indemnify, defend and hold harmless the Seller from and against any and all claims asserted against or incurred by the Seller arising out of any act or failure to act of the Purchaser or its employees, agents or contractors in connection with any inspection by or access to the Purchaser of Seller's offices, assets (including the Purchased Assets) and properties.

Section 5.3    Bankruptcy Actions. The Seller and the Purchaser shall use their commercially reasonable efforts to obtain entry of a Sale Order, or in the alternative to obtain Confirmation of the Debtor's Second Amended Plan of Reorganization dated February 9, 2011, and entered February 14, 2011, provided that Seller's and Buyer's efforts shall comply with any sale procedures approved by the Bankruptcy Court or imposed by the Bankruptcy Code.

Section 5.4    Tax Returns and Filings; Payment of Taxes.  The Seller and the Purchaser shall cooperate with respect to Tax matters. The Seller shall provide the Purchaser with such Tax information and copies of such Tax Returns (in each case, relating to the Purchased Assets or the Business) as the Purchaser may reasonably request, reasonably promptly after such request.

Section 5.5    Transfer Tax Matters.  It is contemplated by the Parties that in accordance with Section 1146(c) of the Bankruptcy Code, the making or delivery of any instrument of transfer, including the filing of any deed or other document of transfer to evidence, effectuate or perfect any rights, transfers and interests in connection with the Contemplated Transactions, shall be in contemplation of a plan or plans of reorganization to be confirmed in the Bankruptcy Cases, and as such shall be free and clear of any and all transfer, documentary, sales, use, registration, value-added and other similar Taxes (including interest, penalties and additions to Tax, "Transfer Taxes"). The instruments transferring the Purchased Assets to the Purchaser shall contain the following endorsement:

"Because this [instrument] has been authorized pursuant to Order of the United States Bankruptcy Court for the Southern District of Texas, Houston Division, in contemplation of a plan of reorganization of the Grantor, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. § 1146(c)."

In the event real estate Transfer Taxes are required to be paid in order to record the deeds to be delivered to Purchaser in accordance herewith, or in the event any such Transfer Taxes are assessed at any time thereafter, such real estate Transfer Taxes incurred as a result of the transactions contemplated hereby shall be paid by Purchaser.

Section 5.6    Employment Matters.

(a)    On or before the fifth (5th) calendar day before the Closing, the Purchaser shall provide to Seller a list of all employees engaged in the Business (the "Business Employees") that the Purchaser wishes to hire effective as of the Closing Date (such list, the "Retainee List"). The Seller shall use commercially reasonable efforts to retain those employees that are listed on the Retainee List from the date of receipt through the Closing Date. The Purchaser acknowledges and agrees that the Seller retains the right to terminate or otherwise alter the terms of employment of all Business Employees other than those whose names are contained in the Retainee List.

(b)    From the date that a winning bidder is announced by GulfStar Group, II, Ltd as provided in the Sales and Bidding Procedures, and provided that Buyer is the winning Bidder, through the Closing Date, the Seller shall permit the Purchaser to communicate orally or in writing with the Business Employees, at reasonable times and upon reasonable notice, regarding the Purchaser's plans, operations, business, customer relations, and general personnel matters. For purposes of this Agreement, a Business Employee who is hired by the Purchaser on or after the Closing Date shall be referred to as a "Hired Employee."

(c)    Except as specifically provided in this Agreement, the Seller shall retain the responsibility for all liabilities relating to compensation earned by a Business Employee for the provision of services to the Seller on or before the Closing Date.

(d)    No provision of this Section 5.6 shall create any rights in any individual who is not a party hereto, including any employee or former employee (including any beneficiary or dependent thereof) of the Seller. Further, this Section 5.6 shall not create any right to continued employment or service (or resumed employment or service) with the Seller, or the Purchaser or its Affiliates with respect to any employee, independent contractor or consultant, and except as between the Parties, no provision of this Section 5.6 shall create any rights in any Person with respect to any benefits that may be provided, directly or indirectly, under any plan or arrangement established by the Seller or any of its Affiliates or any plan or arrangement that may be established by the Purchaser or any of its Affiliates. No provision of this Agreement shall constitute a limitation on the Purchaser's or any of its Affiliates' rights to amend, modify or terminate after the Closing Date any plans or arrangements sponsored or maintained by the Purchaser or any of its Affiliates.

Section 5.7    Additional Matters.    Subject to the terms and conditions herein provided, upon this Agreement being accepted by the Seller and entry of an order approving of both the Sales and Bidding Procedures and a Sales Order authorizing consummation of the sale hereunder, each of the Parties agrees to use commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper, or advisable under applicable laws and regulations to consummate and make effective the Contemplated Transactions.

Section 5.8    Names.  Immediately prior to the Closing, Seller shall (a) amend its governing documents and take all other actions necessary to change its name to one sufficiently dissimilar to Seller's present name, in Purchaser's judgment, to avoid confusion and (b) take all actions requested by Purchaser to enable Purchaser to change its name to one or more names (or derivatives thereof) constituting part of the Purchased Assets.

Section 5.9    Current Evidence of Title.

(a)    As soon as is reasonably possible, and in no event later than fifteen (15) Business Days prior to the closing date of this Agreement, Seller shall furnish to Purchaser, at Seller's expense, for each parcel, tract or subdivided land lot of Owned Real Property:

(i)    from Stewart Title National Division (the "Title Insurer"), title commitments issued by the Title Insurer to insure title to all Owned Real Property pursuant to a policy of title insurance ("Title Policy") in the amount of that portion of the Purchase Price allocated thereto, but in no event in an amount greater than the value listed on Schedule A of the Seller's schedules filed in the Bankruptcy Case, naming Purchaser as the proposed insured (each a "Title Commitment"); and complete and legible copies of all recorded documents listed as Schedule B matters (the "Recorded Documents");

(b)    Each Title Commitment shall include the Title Insurer's requirements for issuing its title policy, which requirements shall be met by Seller on or before the Closing Date (including those requirements that must be met by releasing or satisfying monetary Encumbrances, but excluding Permitted Encumbrances that will remain after Closing and those requirements that are to be met solely by Purchaser).

(c)    If any of the following shall occur (collectively, a "Title Objection"):

(i)    any Title Commitment or other evidence of title or search of the appropriate real estate records discloses that any party other than Seller has title to all or any part of the insured estate covered by the Title Commitment;

(ii)    any title exception is disclosed in Schedule B to any Title Commitment that is not one of the Permitted Encumbrances or one that Seller specifies when delivering the Title Commitment to Purchaser as one that Seller will cause to be deleted from the Title Commitment concurrently with the Closing; or

(iii)    any Survey discloses any matter that does not constitute a Permitted Encumbrance;

then Purchaser shall notify Seller in writing ("Purchaser's Notice") of such matters within ten (10) Business Days after receiving all of the Title Commitments, Surveys and copies of Recorded Documents for the particular item of Owned Real Property or Leased Real Property covered thereby.

## ARTICLE VI.
## POST-CLOSING COVENANTS

Section 6.1    Further Assurances.    In addition to the provisions of this Agreement, from time to time after the Closing Date, the Seller and the Purchaser will use all commercially reasonable efforts to execute and deliver such other instruments of conveyance, transfer, or assumption, as the case may be, and take such other action as may be reasonably requested to implement more effectively the conveyance and transfer of the Purchased Assets to the Purchaser and the assumption of the Assumed Liabilities by the Purchaser.

Section 6.2    Books and Records; Personnel.  For a period ending upon the closure of the Chapter 11 Case:

(a)    Unless the Purchaser shall have first given sixty (60) calendar days' prior written notice to the Seller and any Trustee of any Liquidating Trust created pursuant to a Plan of Reorganization confirmed in Seller's Chapter 11 case, the Purchaser shall not dispose of or destroy any of the business records and files contained in the Purchased Assets other than in connection with a sale or other disposition of the Purchased Assets or any portion thereof. If the Purchaser wishes to dispose of or destroy such records and files after that time, it shall first give sixty (60) calendar days' prior written notice to the Seller, and said Trustee, and the Seller or said Trustee shall have the right, at its option and expense, upon prior written notice to the Purchaser within such sixty (60)-day period, to take possession of the records and files within ninety (90) calendar days after the date of the notice from the Seller. After that time, the Purchaser may dispose of or destroy any such records at its discretion.

(b)    The Purchaser shall allow the Seller and any of its directors, officers, employees, legal counsel, financial advisors, representatives, accountants, professionals, auditors and other agents and any successors thereto (collectively, "Seller's Representatives") access to all business records and files of the Seller that are transferred by the Seller to the Purchasers in connection herewith that are reasonably required by such Person in the administration of the Chapter 11 Case in anticipation of, or preparation for, any existing or future Legal Proceeding involving Seller, Tax Return preparation, litigation, or Excluded Liability, during regular business hours and upon reasonable notice at the Purchaser's principal place of business or at any location where such records are stored, and the Seller's Representatives shall have the right, at their expense, to make copies of any such records and files; provided, however, that any such access or copying shall be effected in such a manner so as not to interfere with the normal conduct of the Purchaser's business or operations.

## ARTICLE VII.
## CONDITIONS PRECEDENT

Section 7.1    Conditions Precedent to Obligation of the Seller.  The obligation of the Seller to effect the Contemplated Transactions shall be subject to the satisfaction at or prior to the Closing Date of the following conditions:

(a)    The Purchaser shall have performed in all material respects its obligations under this Agreement required to be performed by it at or prior to the Closing Date.

19

(b)     All of the representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects on the date hereof and as of the Closing Date as if such representations and warranties were made on and as of that date.

(c)     As of the Closing Date, no litigation, proceeding, investigation or inquiry shall be pending or threatened seeking to enjoin or prevent the consummation of the Contemplated Transactions or to obtain damages or other relief by reason of such consummation.

(d)     The Sales and Bidding Procedures shall have been approved by the court, the Buyer shall have become the winning Bidder, or next highest bidder thereunder, and the Bankruptcy Court shall have entered a Sale Order in substantially the form contemplated by this Agreement and the Sale Order shall have become a Final Order.

(e)     The Purchaser shall have delivered all items and satisfied all obligations pursuant to Section 9.2.

Section 7.2     Conditions Precedent to Obligation of the Purchaser.     The obligation of the Purchaser to effect the Contemplated Transactions shall be subject to the satisfaction at or prior to the Closing Date of the following conditions (compliance with which or the occurrence of which may be waived in whole or in part in a writing executed by the Purchaser, unless such waiver is prohibited by law):

(a)     The Seller shall have performed in all material respects its obligations under this Agreement required to be performed by it at or prior to the Closing Date.

(b)     All of the representations and warranties, of the Seller contained in this Agreement shall be true and correct in all material respects on the date hereof and as of the Closing Date as if such representations and warranties were made on and as of that date.

(c)     As of the Closing Date, no litigation, proceeding, investigation or inquiry shall be pending or threatened seeking to enjoin or prevent the consummation of the Contemplated Transactions or to obtain damages or other relief by reason of such consummation.

(d)     Purchaser shall have received (i) unconditional and binding commitments to issue policies of title insurance consistent with Section 5.9, dated the Closing Date, in an aggregate amount equal to the amount of the Purchase Price allocated to the Owned Real Property, deleting all requirements listed in Schedule B, amending the effective date to the date and time of recordation of the deed transferring title to the Owned Real Property to Purchaser with no exception for the gap between closing and recordation, deleting or insuring over Title Objections as required pursuant to Section 5.9, attaching all endorsements required by Purchaser in order to ensure provision of all coverage required pursuant to Section 5.9 and otherwise in form satisfactory to Purchaser insuring Purchaser's interest in each parcel of Owned Real Property to the extent required by Section 5.9 and (ii) environmental studies or assessments reasonably satisfactory to Purchaser with respect to each parcel of Owned Real Property.

(e)     The Sale Order shall have been entered by the Bankruptcy Court in substantially the form contemplated by this Agreement and shall have become a Final Order.

(f)     The Seller shall have delivered all items and satisfied all obligations pursuant to Section 9.1.

(g)     The Estimated Closing Accounts Receivable Statement shall reflect not less than $1,500,000 of receivables described in subsections (v), (w), (x) and (y) of the Estimated Closing Accounts Receivable Statements owed to the Seller for invoices as of the Closing Date.

(h)     The Estimated Closing Inventory Statement shall reflect a Wallboard Inventory Value of not less than $1,600,000 as of the Closing Date.

## ARTICLE VIII.
## TERMINATION, AMENDMENT AND WAIVER

Section 8.1     Termination by Either the Purchaser or the Seller.  This Agreement shall be terminated at any time prior to the Closing Date if

(a)     the Closing Date shall not have occurred on or before March 4, 2011; or

(b)     the Bankruptcy Court approves a Competing Transaction; or

(c)     the Bankruptcy Court denies both approval of the sale of the Purchased Assets and Confirmation of the Seller's Second Amended Plan of Reorganization dated February 9, 2011, and entered February 14, 2011, in substantially the form originally filed.

Section 8.2     Termination by the Seller.  This Agreement may be terminated at any time prior to the Closing Date by the Seller if there has been a material default made by the Purchaser in the observance or in the due and timely performance by the Purchaser of any agreements and covenants of the Purchaser herein contained, or if there shall have been a breach by the Purchaser of any of the representations and warranties of the Purchaser herein contained, and the default or breach has not been cured or has not been waived within 10 (10) calendar days of written notice thereof.

Section 8.3     Termination by the Purchaser.  This Agreement may be terminated at any time prior to the Closing Date by the Purchaser if

(a)     there has been a material default made by the Seller in the observance or in the due and timely performance by the Seller of any agreements and covenants of the Seller herein contained, or if there shall have been a material breach by the Seller of any of the warranties and representations of the Seller herein contained, and the default or breach has not been cured or has not been waived within ten (10) calendar days of written notice thereof; or

(b)     the Sale Order shall not have been entered by the Bankruptcy Court on or before March 1, 2011, in substantially the form contemplated by this Agreement;

(c)     the Chapter 11 Case is converted to a proceeding pursuant to Chapter 7 of the Bankruptcy Code.

Section 8.4    <u>Effect of Termination and Abandonment</u>.    In the event of termination of this Agreement pursuant to this Article VIII, written notice thereof shall as promptly as practicable be given to the other Parties to this Agreement and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by any of the Parties. Promptly following such termination, the Purchaser shall return all documents and other material received from Seller or any of its Affiliates relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to Seller; and all confidential information received by the Purchaser with respect to the Business shall remain confidential.

Section 8.5    <u>Break-Up Fee</u>. Seller agrees to pay a Break Up Fee to Purchaser in the amounts and under the conditions specified in the Sales and Bidding Procedures.

# ARTICLE IX.
# DELIVERIES AT CLOSING

Section 9.1    <u>Seller's Deliveries at Closing</u>.    In addition to the other things required to be done hereby, at the Closing, the Seller shall deliver, or cause to be delivered, to the Purchaser the following:

(a)    a bill of sale duly executed by the Seller in a form and substance satisfactory to Purchaser and its counsel;

(b)    general warranty deed(s) duly executed by the Seller in a form and substance satisfactory to Purchaser and its counsel;

(c)    an assignment and assumption agreement duly executed by the Seller in a form and substance satisfactory to Purchaser and its counsel;

(d)    a statement setting forth the calculation of the Estimated Asset Value in accordance with Section 1.6(a);

(e)    vehicle titles, or appropriate forms for title transfer, for all vehicles owned by Seller and included in the Purchased Assets, if any;

(f)    updated Exhibits and Seller Disclosure Schedules certified by Seller to be true and correct as of the Closing Date, all in form and substance satisfactory to Purchaser and its counsel;

(g)    copies of all orders of the Bankruptcy Court pertaining to the Contemplated Transactions, including the Sale Order; and

(h)    a certificate dated as of the Closing Date executed by a duly authorized officer of Seller (i) certifying to the effect that all conditions to Closing set forth in paragraphs (a) through (c) of Section 7.2 have been satisfied and (ii) certifying as to the incumbency and signature of the officers of Seller executing any agreements or documents in connection with the Contemplated Transactions.

Section 9.2     Purchaser's Deliveries at Closing.  In addition to the other things required to be done hereby, at the Closing, the Purchaser shall deliver, or cause to be delivered, to the Seller or the Escrow Agent, as applicable, the following:

(a)     a statement setting forth the calculation of the Purchase Price using the Estimated Asset Value determined in accordance with Section 1.6;

(b)     cash in the amount of the Purchase Price, less (i) the Deposit, (ii) the amount of Seller's taxes and assessments prorated under Section 1.9 and (iii) the Holdback Deposit.

(c)     an assignment and assumption agreement duly executed by the Purchaser in a form and substance satisfactory to Seller and its counsel; and

(d)     a certificate dated as of the Closing Date executed by a duly authorized officer of Purchaser (i) certifying to the effect that all conditions to Closing set forth in paragraphs (a) through (c) of Section 7.1 have been satisfied and (ii) certifying as to the incumbency and signature of the officers of Purchaser executing any agreements or documents in connection with the Contemplated Transactions.

Section 9.3     Required Documents.  All documents to be delivered by the Seller or to be entered into by the Seller and the Purchaser necessary to carry out the Contemplated Transactions or contemplated by the terms of this Agreement shall be reasonably satisfactory in form and substance to the Purchaser and counsel to the Purchaser,' and all documents to be delivered by the Purchaser necessary to carry out the Contemplated Transactions or to be entered into by the Seller and the Purchaser necessary to carry out the Contemplated Transactions shall be reasonably satisfactory in form and substance to the Seller and counsel to the Seller.

## ARTICLE X.
## GENERAL PROVISIONS

Section 10.1     Notices.  All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed given upon (a) confirmation of receipt of a facsimile transmission, (b) confirmed delivery by a standard overnight carrier or when delivered by hand, or (c) the expiration of three (3) Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective Parties at the following addresses (or such other address for a party hereto as shall be specified by like notice):

(a)     If to the Purchaser, to:
ISC Acquisition Corp.
2525 McAllister Road
Houston, Texas 77092
Facsimile No.: 713-681-0873
Attn: Narciso Flores

23

With copies to:

Chamberlain, Hrdlicka, White, Williams & Martin
1200 Smith Street, Suite 1400
Houston, Texas 77002
Facsimile No.: 713-658-2553
Attn: James J. Spring, III

(b)   If to the Seller, to:

ISC Building Materials, Inc.
1400 W. Commerce Street
Dallas, Texas 75208
Facsimile No.: 214-748-5125
Attn: Allan Burns, President

With copies to:

Gulfstar Group II, Ltd.
700 Louisiana Street, 38th Floor
Houston, Texas 77002
Facsimile No.: 713-300-2030
Attn: Bryan C. Frederickson

and

Donald L. Wyatt
Wyatt Legal Services, PLLC
26418 Oak Ridge Dr.
The Woodlands, Texas 77380
Facsimile No.: 281-419-8703

Section 10.2   Descriptive Headings; Interpretation.   The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The phrase "including" shall be deemed to mean "including, without limitation," whether or not expressly stated herein.

Section 10.3   Entire Agreement; Assignment.   This Agreement (including the Schedules and Exhibits, the Seller Disclosure Schedule and the other documents and instruments referred to herein) (a) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the Parties, with respect to the subject matter hereof, including any transaction between the Parties, and (b) shall not be assigned by operation of law or otherwise; provided, however, that the Purchaser may assign its rights and obligations hereunder to any subsidiary of Purchaser, but (x) the Purchaser shall not be relieved of its obligations hereunder as a result of such assignment, and (y) to the extent any such assignment by the Purchaser relates to the assignment by the Seller of an executory contract or unexpired

24

lease hereunder and occurs prior to Closing such that, at Closing, this Agreement will provide for the Seller's assignment of such executory contract or unexpired lease to a party other than the Purchaser, such assignment by the Seller shall be subject to all applicable provisions of the Bankruptcy Code.

Section 10.4    Governing Law.  This Agreement shall be governed and construed in accordance with the laws of the State of Texas applicable to contracts made and to be performed entirely within such State by residents of such State.

Section 10.5    Time is of the Essence.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

Section 10.6    Venue and Retention of Jurisdiction.  The Purchaser and the Seller agree that the Bankruptcy Court shall have exclusive jurisdiction over all disputes and other matters relating to (a) the interpretation and enforcement of this Agreement or any ancillary document executed pursuant hereto; and (b) the Purchased Assets and Assumed Liabilities, and the Purchaser expressly consents to and agrees not to contest such exclusive jurisdiction. All Actions brought, arising out of, or related to the Contemplated Transactions shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such Actions.

Section 10.7    Expenses.  Except as otherwise provided herein, whether or not the actions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated thereby shall be paid by the Party incurring such expenses. Seller will pay all amounts payable to the Title Insurer in respect of the Title Commitments, copies of Recorded Documents and financing statements, and the Title Policy, including premiums (including premiums for endorsements) and search fees. Each Party will pay one half of the fees of the Escrow Agent under the Escrow Agreement.

Section 10.8    Amendment.  This Agreement may not be amended, except by an instrument in writing signed on behalf of the Parties and approved, as necessary, by the Bankruptcy Court.

Section 10.9    Counterparts; Effectiveness.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one-and the same agreement. Delivery of an executed counterpart of a signature page of this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.10  Severability; Validity; Parties in Interest.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to other Persons or circumstances, shall not be affected thereby, and to such end, the provisions of this Agreement are agreed to be severable. Nothing in this Agreement, express or implied, is intended to confer upon any Person not a party to this Agreement any rights or remedies of any nature whatsoever under or by reason of this Agreement.

25

Section 10.11 <u>Effectiveness</u>.  This Agreement is contingent, and shall become effective, upon the approval by the Bankruptcy Court of the Sale Order. Payment of the Break-Up Fee is contingent, and shall become an obligation of the Seller, upon entry by the Bankruptcy Court of an order approving the Break-Up Fee in connection with the sale of the Purchased Assets.

## ARTICLE XI.
## DEFINITIONS

Section 11.1   <u>Defined Terms</u>.  Except as set forth in the text of this agreement, as used herein, the terms below shall have the following meanings.

"<u>Action</u>" means any claim, suit, action, arbitration, inquiry, proceeding, investigation, charge or complaint.

"<u>Affiliate</u>" means, with respect to any Person, any direct or indirect Subsidiary of such Person, and any other Person that, directly, or through one or more intermediaries, controls or is controlled by or is under common control with such first Person, and, if such a Person is an individual, any member of the immediate family (including parents, spouse and children) of such individual and any trust whose principal beneficiary is such individual or one or more members of such immediate family and any Person who is controlled by any such member or trust. As used in this definition, "<u>control</u>" (including, with correlative meanings, "<u>controlled by</u>" and "<u>under common control with</u>") means possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

"<u>Agreement</u>" has the meaning set forth in the introductory paragraph to this Agreement.

"<u>Assignment and Assumption Agreement</u>" means a bill of sale, assignment and assumption agreement in such form as may be agreed to by the Purchaser and the Seller.

"<u>Bankruptcy Cases</u>" means the Chapter 11 bankruptcy case of ISC Building Materials, Inc., administered under Case No. 10-35732 in the Bankruptcy Court.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Preamble and, with respect to an appeal from any order or determination of the Bankruptcy Court, any court having jurisdiction over such appeal.

"<u>Business</u>" has the meaning set forth in the Preamble and expressly excludes the supplying of lumber and related products by Seller.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday, or other day on which banking institutions in Houston, Texas are authorized or required by law or executive order to close.

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Competing Transaction" means a sale of all or any part of the Purchased Assets to a competing bidder pursuant to the terms of the Order Approving (I) Sale and Bidding Procedures and (II) Form of Notice for Sales Under Section 363 of the Bankruptcy Code, entered on January 24, 2011 by the Bankruptcy Court.

"Consulting Agreements" means those certain consulting agreements to be entered into by the Purchaser and designated members of the Seller's senior management on or before the Closing Date and in a form and substance satisfactory to the parties thereto.

"Contemplated Transactions" means the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated hereby, and the related transactions contemplated by this Agreement.

"Customer Information" means customer lists, files and records, advertising and marketing data and records, sales and pricing data, customer prospect lists and customer data.

"Encumbrances" means any mortgage, license, security interest, pledge, lien, charge, claim, judgment, option, right, voting or other restriction, right-of-way, covenant, condition, easement, encroachment, restriction, or other third-party right or title defect or encumbrance of any nature whatsoever, whether legal or equitable in nature, whether contractual, statutory or common law in origin, and including any interest in property (as such term is used in Section 363(f) of the Bankruptcy Code).

"Final Order" means an order or determination by the Bankruptcy Court, (a) that is not reversed, stayed, enjoined, set aside, annulled, or suspended within the deadline, if any, provided by applicable statute or regulation, (b) with respect to which no request for stay, motion or petition for reconsideration, application or request for review, or notice of appeal or other judicial petition for review that is filed within such period is pending, and (c) as to which the deadlines, if any, for filing any such request, motion, petition, application, appeal or notice have expired.

"GAAP" means United States generally accepted accounting procedures.

"Governmental Authority" means any federal, state, local, municipal, foreign or international court, tribunal, judicial body, government, department, commission, board, bureau, agency, official, instrumentality or other regulatory, administrative or governmental authority.

"IRS" means the Internal Revenue Service.

"Knowledge" means the actual knowledge of the Seller.

"Lease Agreements" means those certain lease agreements to be entered into by the Purchaser and the lessors of the Dallas, San Antonio, Houston and Fort Worth locations on or before the Closing Date and in a form and substance satisfactory to the parties thereto.

"Leased Real Property" means the leasehold interests of the Seller in and to the facilities constructed or operated by the Seller at the Houston, Dallas, San Antonio, and Fort Worth locations, including the Seller's corporate office at the Dallas location, all as more fully described on Section 1.1(b) of the Seller Disclosure Schedule (the "Leased Real Property").

"Legal Proceeding" means any Action pending at law or in equity before any Governmental Authority or arbitral body.

"Material Adverse Effect" means any effect, event, occurrence or state of facts that, individually or aggregated with other effects, events, occurrences or states of facts, (a) would after the Closing be materially adverse to or materially impair (i) the value or condition of the Purchased Assets or Assumed Liabilities, or (ii) the ability of any Party hereto to perform its obligations under this Agreement, or (b) gives rise to any material liability that would be an Assumed Liability from or after the Closing or materially increases any Assumed Liability.

"Parties" means the Purchaser and the Seller.

"Permitted Encumbrances" means with respect to or upon any of the Purchased Assets, whether owned, leased, subleased, occupied or licensed as of the date hereof or thereafter, (a) any easement, encroachment or similar reservation incurred or suffered in the ordinary course of business and that would not, individually or in the aggregate, be reasonably expected to impair the use, occupancy, or value, or the marketability of title, of such Purchased Assets; (b) Assumed Liabilities under Assumed Contracts; (c) liens imposed by law, such as carriers', warehouseman's, mechanics', materialmen's, landlords', laborers', suppliers', and vendors' liens, incurred in good faith in the ordinary course of business and securing obligations that are not yet due; (d) liens imposed by law for Property Taxes that are not yet due, (e) liens that are excused or unenforceable from and after the Closing Date as a result of the filing of the Petition or the applicability of the Bankruptcy Code; (f) deposits or liens to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds and other obligations of a like nature, in each case in the ordinary course of business; and (g) extensions, renewals and replacements of the foregoing.

"Person" means any natural person, firm, partnership, limited liability company, association,, corporation, trust, business trust or other entity.

"Pre-Closing Tax Period" means any taxable period (or portion thereof) ending on or prior to the Closing Date.

"Property Taxes" means real, personal and intangible ad valorem property taxes.

"Purchase Price Assumed Liabilities" shall be equal to the amount, in the aggregate, of the Assumed Liabilities described in Section 1.3 as properly reflected as liabilities

or obligations of the Business on the Seller's balance sheet as of the Closing Date prepared in accordance with generally accepted accounting principles.

"Sale Order" means an order of the Bankruptcy Court approving this Agreement, that is consistent with the terms of the Order Approving (I) Sale and Bidding Procedures and (II) Form of Notice for Sales Under Section 363 of the Bankruptcy Code, entered on January 24, 2011 by the Bankruptcy Court, and that is in substantially the form of Exhibit A.

"Subsidiary" means any subsidiary of the Purchaser or the Seller, as the case may be.

"Taxes" means all United States federal, state and local, and foreign taxes, and other assessments of a similar nature (whether imposed directly or through withholding), including any interest, additions to tax, or penalties applicable thereto.

"Tax Returns" or "Returns" means all United States federal, state and local, and foreign Tax returns, declarations, statements, reports, schedules, forms, and information returns and any amended Tax Returns relating to Taxes.

IN WITNESS WHEREOF, the Purchaser and the Seller have caused this Agreement to be executed on their behalf by their officers thereunto duly authorized, as of the date first above written.

ISC ACQUISITION CORP.

By: _____
    Narciso Flores, President


ISC Building Materials, Inc.


By: _____
    Allan Burns, President

0811851.09

**Exibit A**

SALE ORDER

[To be provided by Seller.]

## Exibit 1.1(a)

OWNED REAL PROPERTY

<u>Tyler, Texas</u>

ALL THAT CERTAIN 2.2248 ACRE TRACT OF LAND, SAME BEING
OUT OF AND A PART OF THE REMAINDER OF A 12.71 ACRE TRACT
IN THE HUGH WALL SURVEY NO. 374, ABSTRACT 1042, IN SMITH
COUNTY, TEXAS, WHICH 12.71 ACRE TRACT WAS CONVEYED TO
THOMAS I. PINKERTON BY DEED DATED DECEMBER 3, 1938, AND
RECORDED IN VOLUME 381, PAGE 501, DEED RECORDS OF SMITH
COUNTY, TEXAS, AND WHICH 2.2248 ACRE TRACT IS MORE PAR-
TICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A 2" IRON PIPE FOUND AT THE INTERSECTION OF
THE EAST BOUNDARY LINE OF SAID 12.71 ACRE TRACT AND THE
NORTH RIGHT OF WAY LINE OF LOOP 323,

THENCE NORTH 76 DEGREES 31 MINUTES 50 SECONDS WEST, ALONG
SAID NORTH RIGHT OF WAY LINE, A DISTANCE OF 323.79 FEET
TO AN IRON ROD FOUND FOR CORNER IN THE MOST WESTERLY NORTH
BOUNDRY LINE OF SAID 12.71 ACRE TRACT:

THENCE NORTH 00 DEGREES 23 MINUTES 07 SECONDS EAST, ALONG
SAID MOST WESTERLY NORTH BOUNDRY LINE, A DISTANCE OF 81.85
FEET TO CORNER POST FOUND FOR CORNER:

THENCE NORTH 0 DEGREES 25 MINUTES 47 SECONDS WEST, ALONG
THE MOST NORTHERLY WEST BOUNDRY LINE OF SAID 12.71 ACRE
TRACT, A DISTANCE OF 194.94 FEET TO AN IRON ROD FOR CORNER:

THENCE SOUTH 89 DEGREES 26 MINUTES 23 SECONDS EAST, ALONG
THE MOST NORTHERLY NORTH BOUNDRY LINE OF SAID 12.71 ACRE
TRACT, A DISTANCE OF 282.00 FEET TO AND IRON ROD FOR
CORNER:

THENCE SOUTH 6 DEGREES 12 MINUTES 45 SECONDS EAST A DIS-
TANCE OF 147.64 FEET TO A CORNER POST FOR CORNER:

THENCE NORTH 82 DEGREES 15 MINUTES 05 SECONDS EAST, A
DISTANCE OF 131.40 FEET TO AN IRON ROD FOR CORNER IN THE
EAST BOUNDRY LINE OF SAID 12.71 ACRE TRACT:

THENCE SOUTH 0 DEGREES 05 MINUTES WEST, ALONG SAID EAST
BOUNDRY LINE, A DISTANCE OF 190.88 FEET TO THE PLACE OF
BEGINNING AND CONTAINING 2.2248 ACRES OF LAND, MORE OR
LESS.

<u>Austin, Texas</u>

[To be provided by Seller].

**Exibit 1.1(c)**

INCLUDED TANGIBLE PROPERTY

(see attached)

LOCATION: TYLER

| | UNIT NO | MILES/ HOURS | VEHICLE TYPE | LICENSE PLATE | VIN NO | YEAR | BRAND | MODEL | CONDITION | GENERAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 131 | 38,172.00 | BOOM TRUCK | 86V-FP3 | 2FZHAZCV25AV13074 | 2005 | STERLING | LT9500 | GREAT | |
| 2 | 1318 | 840.00 | KNUCKLE CRANE | N/A | ? | 2006 | HIAB | 1336K-4 | GREAT | |
| 3 | 132 | 298,922.00 | SEMI | 2NM-764 | 2HISCBAH3X2C041894 | 2001 | INTERNATIONAL | 9100I 16X4 | USED-OK | |
| 4 | 95 | 375,701.00 | FLAT BED | 86M-FP3 | 2FVYHWDB1YAF7879 | 1999 | STERLING | AT 9500 | OLD-WELL USED | |
| 5 | 119 | 193,410.00 | FLAT BED | 84N-WG4 | JFDNF60C4WVA44840 | 1997 | FORD | AT 800 | OLD-WELL USED | |
| 6 | 80 | 292,862.00 | FLAT BED | 86K-YY3 | JFDNF60C0VVA19753 | 1997 | FORD | F800 | OLD-WELL USED | |
| 7 | 83 | 77,681.00 | PICKUP | 08E-CP2 | 1FTNF20505EB07?6 | 2005 | FORD | F250 | WELL USED | |
| 8 | 858 | 980.00 | SPIDER LIFT | N/A | 750101 | 2003 | MANITOU | TM1380FLHTW | GOOD | |
| 9 | 858 | 1,238.00 | SPIDER LIFT | N/A | 780121 | 2003 | MANITOU | TM1380FLHTW | WELL USED | |
| 10 | 6?8 | ? | PALLET JACK | N/A | 6A14024G | ? | CROWN | PE3500-60 | OLD-WELL USED | ELECTRIC POWERED HAND JACK |
| 11 | 548 | 1.00 | 4X4 LIFT | N/A | CAT0TH63E3FN04420 | 2002 | CATERPILLAR | TH63 | OLD-WELL USED | |
| 12 | 534 | 5,666.00 | FORK LIFT | N/A | 610350A | 2003 | KOMATSU | FG35 HT-12 | WELL USED | |
| 13 | 853 | 8,609.00 | FORK LIFT | N/A | 100281A | 2002 | KOMATSU | FD45T2-7 | WELL USED | |
| 14 | 333 | N/A | SEMI TRAILER | 472-292Z | 1L01B4ISAJ1080867 | 1988 | LUFKIN | LM-80 ST | OLD-OK | |
| 15 | 347 | N/A | PUP TRAILER | 0T7-44A | TH1389358 | 2002 | WASHBURN | ? | OLD-WELL USED | |
| 16 | 333 | N/A | EQUIP TRLR | 479-G58 | 1JKDLA4K27A000828 | 2007 | INTERSTATE | 40DLA | GOOD | |

06173586.01

**LOCATION: AUSTIN**

| UNIT NO | MILES/ HOURS | VEHICLE TYPE | LICENSE PLATE | VIN NO | YEAR | BRAND | MODEL | CONDITION | GENERAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 126 | 82,467.30 | BOOM TRUCK | 59W-PR8 | 2FZ2NADX0G6RLJ9073 | 2006 | STERLING | | GOOD | |
| 2 | 1288 | N/A | KNUCKLE CRANE | N/A | ? | ? | HIAB | 330K | GOOD | |
| 3 | 113 | 387,747.90 | SEMI | 2N4-781 | 2HSHAKER1YC833979 | 2000 | INTERNATIONAL | 9100 8X4 | WELL USED | STEEL DECK |
| 4 | 67 | 80,398.00 | FLATBED | 02L-8Y1 | 1FV6BJAKXYHPF06629 | 2000 | FREIGHTLINER | | WELL USED | NOT AS NICE AS BOOM TRUCK |
| 5 | 129 | 58,000.00 | FLATBED | 60W-PP9 | 2FZHZADCXV6BAU15021 | 2006 | STERLING | | GOOD | NOT AS NICE AS BOOM TRUCK |
| 6 | 553 | 1,321.50 | SPYDER LIFT | N/A | 751143 | 2005 | MANITOU | TMT320HTVW | ROUGH | |
| 7 | 607 | N/A | PALLET JACK | N/A | ? | ? | ? | ? | ROUGH | NO VALUE |
| 8 | 608 | N/A | PALLET JACK | N/A | ? | ? | ? | ? | ROUGH | NO VALUE |
| 9 | 611 | N/A | PALLET JACK | N/A | ? | ? | ? | ? | ROUGH | NO VALUE |
| 10 | 588 | 56.20 | 4X4 LIFT | N/A | CAT0TH83P3RN06118 | 2002 | CATAPILLAR | TH83 | WELL USED | REPAIRED CYLINDERS THROUGHOUT |
| 11 | 640 | 8,815.10 | FORKLIFT | N/A | 3CM12773 | 2000 | CATAPILLAR | DPL40 | WELL USED | CONVERTED TO SINGLE WHEEL IN FRONT |
| 12 | 582 | 2,065.30 | FORKLIFT | N/A | AF18C50200 | 2006 | MITSUBISHI | FD40KL1 | WELL USED | GREEN LIFT IN PICS - NO NUMBER |
| 13 | 555 | 6,516.60 | FORKLIFT | N/A | AF82C-03143 | 2001 | MITSUBISHI | FG25SK | WELL USED | YELLOW SMALL LIFT IN PICS - NO NUMBER |
| 14 | 318 | N/A | SEMI TRLR | 469-3R2 | 1HSP542296N096001 | 1981 | HOBB | N/A | WELL USED | OLD |
| 15 | 357 | N/A | PUP TRAILER | 812-5YZ | N/A | 2002 | N/A | N/A | WELL USED | STEEL DECK |
| 16 | 353 | N/A | EQUIP TRLR | 979-86G | N/A | 1999 | INTERSTATE | N/A | WELL USED | STEEL DECK |

0912386.01

LOCATION: FORT WORTH

| UNIT NO | MILES/ HOURS | VEHICLE TYPE | LICENSE PLATE | VIN NO | YEAR | BRAND | MODEL | CONDITION | GENERAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| 123 | 83,326.00 | FLAT BED | 58W-PF3 | 2FZHAZCY76AU19088 | 2006 | STERLING | LT9500 | GOOD | IN THE SHOP |
| 901 | N/A | PALLET JACK | N/A | 6A139088 | ? | CROWN | PE3500-80 | OLD-WELL USED | ELECTRIC POWERED HAND LIFT |
| 910 | N/A | PALLET JACK | N/A | 6A134815 | ? | CROWN | PE3500-80 | OLD-WELL USED | ELECTRIC POWERED HAND LIFT |
| 521 | 4,891.00 | 4X4 LIFT | N/A | 3WM01626 | 1999 | CATAPILLAR | TH63 | OLD-WELL USED | |
| 549 | 9,398.00 | FORKLIFT | N/A | 3CM112989 | 2000 | CATAPILLAR | DP4.40 | USED-OK | |
| 525 | 10,393.00 | FORKLIFT | N/A | 3CM112261 | 2005 | CATAPILLAR | DP40 | WELL USED | |

LOCATION: SAN ANTONIO

| | UNIT NO | MILES/ HOURS | VEHICLE TYPE | LICENSE PLATE | VIN NO | YEAR | BRAND | MODEL | CONDITION | GENERAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 125 | 79,366.20 | BOOM TRUCK | 57W-PP9 | 2FZHAZCV46AW28246 | 2006 | STERLING | LT9500 | GOOD | |
| 2 | 125B | N/A | KNUCKLE CRNE | N/A | ? | ? | ? | 33SK | GOOD | |
| 3 | 112 | 325,784.00 | SEMI | 2NM-77P | ? | 1998 | FREIGHTLINER | 8200.60X4 | WELL USED | |
| 4 | 78 | 431,606.10 | FLATBED | 45W-PP8 | 1FUYDSYB8SH7H2777 | 1995 | FREIGHTLINER | ? | OLD USED | |
| 5 | 127 | 71,187.00 | FLTBD/SPYDR | 58W-PF5 | 3FRWF7GS13V426510 | 2006 | STERLING | ? | USED OK | MERCEDES ENGINE |
| 6 | 128 | 109,346.00 | FLATBED | 24D-MW7 | 3FRWF7GS13V426510 | 2008 | FORD | F750 | USED OK | |
| 7 | 587 | $98.00 | SPYDER | N/A | F360149 | 2008? | MOFFET | LP9500 | GOOD | MAN. DATE 09/06 |
| 8 | 572 | ? | 4X4 LIFT | N/A | ? | ? | CATAPILLAR | THES | USED OK | |
| 9 | 566 | 1,063.70 | FORKLIFT | N/A | AF19C30202 | ? | MITSUBISH# | PD40KL1 | GOOD | DUAL WHEEL |
| 10 | 569 | 4,182.50 | FORKLIFT | N/A | AT19C20687 | 3 | CATAPILLAR | DP40KLI | USED OK | |
| 11 | 394 | N/A | SEMI TLR SPY | NO PLATE | 1F1T7111890006116 | ? | TRAILERMOBILE | F7Y7-7UAI | OLD USED | |
| 12 | 343 | N/A | SEMI TRAILER | X7T-819 | 1GRD7??????? | ? | ? | ? | USED OK | ALUMINUM |
| 13 | 655 | N/A | PUP TRAILER | 802-5NZ | ? | ? | ? | ? | USED OK | |
| 14 | 350 | N/A | EQUIP TRLR | 79V-M9H | ? | 2007 | HIAB / INTERSTATE | MH10HT / 4D DLA | USED OK | 4X4 LIFT TRAILER |

LOCATION: HOUSTON

| UNIT NO | MILES/ HOURS | VEHICLE TYPE | LICENSE PLATE | VIN NO | YEAR | BRAND | MODEL | CONDITION | GENERAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 122 | 107,698.30 | BROOM TRUCK | 54W-5F9 | 2FZHAZCA71TH982833 | 2007 | STERLING | 285K | GOOD | 13.8L MERCEDES |
| 2 | 1233 | N/A | KNUCKLE CRANE | N/A | ? | ? | HIAB | ? | GOOD | DAY CAB 14.0L CUMMINS |
| 3 | 117 | 391,813.20 | SEMI | 2DR-R54 | 1HSGBAWT3HJ09939 | 2001 | INTERNATIONAL | 8100 6X4 | GOOD | 365HP |
| 4 | 118 | 202,492.90 | FLATBED | 58Z-VN4 | 1HTMPAFM95H138637 | 2005 | INTERNATIONAL | 4300SBA 4X2 | GOOD | 10.8L CUMMINS |
| 5 | 120 | 129,976.00 | FLATBED | 50W-F95 | 1HTWYAHT27J440695 | 2007 | INTERNATIONAL | 7400SBA 6X4 | WELL USED | 10.8L CUMMINS |
| 6 | 121 | 126,062.00 | FLATBED | 2H5-8683 | 1HTWYAHT27J440662 | 2007 | INTERNATIONAL | 7400SBA 6X4 | GOOD | 10.8L CUMMINS |
| 7 | 48 | 1,488.01 | SPIDER LIFT | N/A | 17815B | 2002 | MANITOU | TMT320 FLHTW | WELL USED | REAR ROUGH - HYDRO LEAKS - FILTHY |
| 8 | 564 | 748.70 | SPIDER LIFT | N/A | 7518B1 | 2004 | MANITOU | TMT320 FLHT | GOOD | |
| 9 | 595 | 3,990.40 | 4X4 LIFT | N/A | 78L08149 | ? | CATAPILLAR | TH83 | WELL USED | ALL TERRAIN LIFT CONDITION UNKNOWN |
| 10 | 557 | 5,763.40 | FORKLIFT | N/A | AT19C01173 | ? | CATAPILLAR | DP40K | WELL USED | DUAL WHEEL - FUEL 8000LB |
| 11 | 47 | 4,193.00 | FORKLIFT | N/A | 9CM10222 | ? | CATAPILLAR | DP40D | WELL USED | MED SINGLE WHEEL - FUEL 8000LB |
| 12 | 537 | 8,576.90 | FORKLIFT | N/A | 9CM12874 | ? | CATAPILLAR | DLP40D | WELL USED | DUAL WHEEL - FUEL 9000LB HYDRO LEAKS |
| 13 | 556 | 7,946.80 | FORKLIFT | N/A | AF8CC-03144 | ? | MITSUBISHI | FGC25K | USED | SINGLE WHEEL - PROPANE 5000LB |
| 14 | 301 | N/A | SEMI TRAILER | Y51-73B | 1FFFP7YTJ65000615D | 1985 | ? | ? | USED | SEMI FLATBED TRAILER 46' 12,000LB |
| 15 | 242 | N/A | PUP TRAILER | 72W-TYN | 8509519 | 1986 | ? | ? | WELL USED | PUP TRAILER - DAMAGED JACK STAND |
| 16 | 239 | N/A | PUP TRAILER | 68T-78D | MMF51827713440685 | 2000 | ? | ? | WELL USED | PUP TRAILER - NO JACK STAND |
| 17 | 351 | N/A | EQUIP TRLR | 20W-T7N | 1JDLA6034M004881 | 2004 | ? | ? | WELL USED | LULL TRLR - DESTROYED JACK STAND |

LOCATION: DALLAS

| | UNIT NO | MILES/ HOURS | VEHICLE TYPE | LICENSE PLATE | VIN NO | YEAR | BRAND | MODEL | CONDITION | GENERAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 120 | 538,930.00 | BOOM TRUCK | 56W-PP6 | 2FZHAZCV08AV18039 | 2006 | STERLING | LT9500 | GOOD | |
| 2 | 124B | N/A | KNUCKLE CRANE | N/A | ? | ? | HIAB | 385HA | GOOD | |
| 3 | 91 | 264,044.00 | BOOM TRUCK | 49W-PP9 | 2FZXKEQ9X0AA09882 | 1999 | STERLING | L9500 | OLD-WELL USED | |
| 4 | 61B | N/A | KNUCKLE CRANE | N/A | ? | ? | FASSI | F200 | OLD-WELL USED | |
| 5 | 92 | 231,485.00 | SEMI | 2NP-782 | 1H9V63AL10N1809849 | 1998 | INTERNATIONAL | 9200 SE DA | OLD-WELL USED | |
| 6 | 130 | 59,483.00 | FLAT BED | 61W-PP9 | 2FTXXXCV06AV19341 | 2005 | STERLING | LT9500 | GOOD | |
| 7 | 82 | 316,777.00 | FLAT BED | 98W-HN2 | 1XTXXXH08PA939289 | 1998 | STERLING | 8100 8XA | OLD-WELL USED | |
| 8 | 74 | 53,782.00 | FLAT BED | 49W-PP9 | 2FZXXXZAV81AH79385 | 2000 | STERLING | LT9500 | OLD-WELL USED | |
| 9 | 28 | 81,884.00 | FLAT BED | 87T-DDR | 1HTSBAAM0TH254168 | 1995 | INTERNATIONAL | 4900 4X2 | OLD-WELL USED | NOT RUNNING DRAFTSHAFT OUT |
| 10 | 116 | 239,801.00 | FLAT BED | AH6-45DM | 1FDNF82C7VVA29203 | 1997 | FORD | F-800 | OLD-WELL USED | IN SHOP NOT RUNNING |
| 11 | 82 | 251,488.00 | FLAT BED | 220-8AG | 1FDNF82C7TVA19203 | 1995 | FORD | F-800 | OLD-WELL USED | |
| 12 | 31 | 373,287.00 | FLAT BED | AH7-435H | 1HTSCAAM3WH358632 | 1997 | INTERNATIONAL | 4700 DT 466E | JUNKED-USING PARTS TO FIX UNIT 26 | |
| 13 | 38 | 134,687.00 | PICKUP | 96T-L91 | 1GTHC24U74E272573 | 2004 | GMC | 2500HD | WELL USED | |
| 14 | 599 | 622.00 | SPIDER LIFT | N/A | 1FDNF82C7WVA29203 | 2004 | PALFINGER CRAILER | CR55 | WELL USED | |
| 15 | 579 | 2,365.00 | SPIDER LIFT | N/A | 209704 | 2000 | MOFFET | M-5000 | OLD OK | |
| 16 | 605 | N/A | PALLET JACK | N/A | 6A149867 | 1997 | CROWN | PE3820-60 | WELL USED | ELECTRIC POWERED HAND LIFT |
| 17 | 609 | N/A | PALLET JACK | N/A | PMWV925568 | ? | MITSUBISHI | PMW R30 | WELL USED | ELECTRIC POWERED HAND LIFT |
| 18 | 528 | 3,040.00 | 4X4 LIFT | N/A | BWM362373 | 1999 | CATAPILLAR | TH63 | GOOD | |
| 19 | 528 | 48.00 | FORKLIFT | N/A | 100E-SS-9033 | 1998 | CATAPILLAR | DP45 | WELL USED | |
| 20 | 561 | 4,300.00 | FORKLIFT | N/A | AT19C05801 | 2007 | CATAPILLAR | DP40KL | WELL USED | ELECTRIC POWERED LIFT |
| 21 | 571 | 402.00 | FORKLIFT | N/A | N27T0012 | 2007 | DOOSAN | B45X-5 | GOOD | |
| 22 | 639 | 6,632.00 | FORKLIFT | N/A | 3CM11305 | 2007 | CATAPILLAR | DPL40 | OLD-WELL USED | |
| 23 | 570 | 409.00 | FORKLIFT | N/A | N2-00087 | 2007 | DOOSAN | B45X-5 | GOOD | ELECTRIC POWERED LIFT |
| 24 | 340 | N/A | PUP TRAILER | 48X-BLB | ? | ? | WASHBURN | ? | GOOD | NO INFORMATION ON TRAILER |
| 25 | 354 | N/A | PUP TRAILER | 197-JOO | 1Z9PS16283C010668 | 2002 | INDEPENDENT | 1825-SP | WELL USED | |
| 26 | 566 | N/A | EQUIP TRLR | 362-PTT | 1JKDLAA03BM009648 | 2006 | INTERSTATE | 40 DLA | GOOD | |

**LIST OF ISC EQUIPMENT TO BE PURCHASED BY NARCISO FLORES:**

Warehouse equipment as described on the attachments broken down by six locations plus all other equipment in the warehouse and yards. Including all equipment in the mechanics area in the Dallas location.

Office equipment to include PCs with software licenses, routers, faxes, desks, chairs, phones, alarms, paper forms, printers, fans, filing cabinets, stands, bookcases, stationery, counters, etc. at all six locations. In addition the servers with software licenses at the Dallas locations server room identified through labels on the equipment as follows: IBM Enterprise Server H80, Dalaxch, Dalepacubq, DalSQL, Dalpos, Dalserver5, Dalmaxrecall, Dalserver3, ISCBM13, Dalcommerce, Dalttermz, Dalserver, Daltterm1, Dalterm4, Dalpdc2, Adisercer1, Dalserver7, Dallax1, Tanntella, Dalserver9, Dalta, Dalporta and numerous batteries.

**<u>Exibit 1.1(d)</u>**

WALLBOARD INVENTORY

[To be provide by Seller two (2) business days prior to Closing.]

**Exibit 1.1(e)**

ASSUMED CONTRACTS

Current leases for Seller's Houston, Dallas and San Antonio locations.

**Exibit 1.1(o)**

ACCOUNTS RECEIVABLE

[To be provided by Seller two (2) business days prior to Closing.]